UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,

     v.                                NO. 22 Cr. 116 (NRB)

CARMINE SARNELLI,

       Defendant.

-------------------------------------------------------x

# DEFENDANT CARMINE SARNELLI'S POST-HEARING BRIEF IN SUPPORT OF HIS MOTION TO SUPPRESS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................3

PRELIMINARY STATEMENT ...........................................................................................5

ARGUMENT........................................................................................................................7

      1.      **The New Order Form Story Does Not Support That Agent Dean and Detective Johnson Believed They Had Probable Cause to Arrest Mr. Sarnelli on the LIE**..................................................................................7

      2.      **The Government Did Not Have Probable Cause to Search Mr. Sarnelli's Backpack**.................................................................12

      3.      **Mr. Sarnelli Did Not Consent to the Unlawful Search of His Backpack** .......16

      4.      **The Inevitable Discovery Doctrine Does Not Apply to the Unlawful Search of Mr. Sarnelli's Backpack**..................................................19

CONCLUSION...................................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Bumper v. North Carolina*,
    391 U.S. 543 (1968) ...................................................................................................16

*Illinois v. Gates*,
    462 U.S. 213 (1983) ...................................................................................................12

*Illinois v. Lafayette*,
    462 U.S. 640 (1983) ...................................................................................................19

*Michigan v. Long*,
    463 U.S. 1032 (1983) .................................................................................................17

*Schneckloth v. Bustamonte*,
    412 U.S. 218 (1973) ...................................................................................................16

*United States v. Barone*,
    721 F. Supp. 2d 261 (S.D.N.Y. 2010) .......................................................................17

*United States v. Cancel*,
    167 F. Supp. 3d 584 (S.D.N.Y. 2016) .......................................................................19

*United States v. Hussain*,
    835 F.3d 307 (2d Cir. 2016)........................................................................................18

*United States v. Isiofia*,
    370 F.3d 226 (2d Cir. 2004)........................................................................................16

*United States v. Mapp*,
    476 F.2d 67 (2d Cir. 1973)..........................................................................................17

*United States v. Mendez*,
    315 F.3d 132 (2d Cir. 2002)................................................................................. 19, 20

*United States v. Morillo*,
    No. 08 CR 676(NGG), 2009 WL 3254431 (E.D.N.Y. Oct. 9, 2009)..............................20

*United States v. Ross*,
    456 U.S. 798, 798 (1982).............................................................................................12

*United States v. Sanchez*,
    635 F.2d 47 (2d Cir. 1980)............................................................................................16

*United States v. Scott,*
No. 09 CR 331(HB), 2009 WL 4975269 (S.D.N.Y. June 8, 2009) ................................20

*Wyoming v. Houghton,*
526 U.S. 295 (1999) ...............................................................................................12

**PRELIMINARY STATEMENT**

The defendant Carmine Sarnelli respectfully submits this Post-Hearing Brief to Suppress Unlawfully Obtained Evidence.  The government's primary contention at the hearing was that Agent Matthew Dean had obtained authorization from the U.S. Attorney's Office on April 21, 2021, to arrest Mr. Sarnelli if he traveled from Manhattan to Long Island.  This new theory, which seeks to neutralize the two failed search warrant applications in early May 2021, did not appear in Agent Dean's prior reports or affidavits or in the government's prior filings.  The government also tried to use various exhibits at the hearing to expand the factual basis for probable cause to conduct a warrantless automobile search.  The facts do not support the government's arguments.  In assessing the facts, defense counsel respectfully requests the Court to consider the following points.

First, Agent Dean's testimony that he relied on the April 21, 2021 Operations Order Form to arrest Mr. Sarnelli is uncorroborated and inconsistent with his contemporaneous reports both before and after Mr. Sarnelli's arrest.  The Court should reject this new theory, which the government advanced for the first time at the hearing.

Second, Mr. Sarnelli's trip to Manhattan on May 15, 2021, did not create probable cause to believe that the Trailblazer he was traveling in contained evidence of narcotics trafficking. The informant information the government seeks to rely on for probable cause was unreliable and stale, which is why the AUSAs drafted a Complaint that described the LIE encounter as a traffic stop followed by consent searches.  The AUSAs and the officers knew that just days before Mr. Sarnelli's arrest, two Magistrate Judges rejected the reliability of Sagan, the only confidential source who claimed to have any information in 2021 on how Mr. Sarnelli obtained narcotics.

Third, the government's presentation at the hearing never answered the question of why the AUSAs, Det. Johnson and Agent Dean formulated a sworn Complaint recounting a Traffic Stop Story that the government now disavows.  The government conceded that it no longer relies on the Covid mask that was the purported basis for the traffic violation to explain or justify anything the officers did on May 15, 2021.  (Tr. 97.)  Both officers testified at the hearing that they conducted a felony car stop commencing with the immediate gunpoint arrest of Mr. Sarnelli—a version of events completely at odds with the Traffic Stop Story.  The fundamental change in their sworn accounts bears heavily on their credibility.

Fourth, through intimidation, an illegal search, and unmirandized questioning, Det. Johnson and Agent Dean created a coercive environment in which Mr. Sarnelli did not voluntarily consent to the search his backpack.  Det. Johnson's testimony that Mr. Sarnelli gave valid consent was unreliable and was not corroborated by Agent Dean or Officer Coyne.

Finally, Agent Dean's suggestion that the contents of Mr. Sarnelli's backpack would have inevitably been discovered through an inventory search of Kara Caulfield's vehicle was legally baseless.  The vehicle that contained Mr. Sarnelli's backpack was in the custody of Caulfield, who was not placed under arrest according to the testimony of Det. Johnson and Agent Dean.

## <u>ARGUMENT</u>

**1. The New Order Form Story Does Not Support That Agent Dean and Detective Johnson Believed They Had Probable Cause to Arrest Mr. Sarnelli on the LIE**

At the suppression hearing, the government advanced a new and different account from Agent Matthew Dean following a new and significant pre-hearing factual disclosure. This marked the second instance in this litigation in which a new factual assertion emerged to counteract and seemingly neutralize the disclosure by the government of a bad fact.

The first instance is set forth in our Reply Brief, in which we recounted how the officers' explanation for the stop/arrest/seizure migrated from a Traffic Stop Story (involving a traffic violation followed by consensual searching) to a Cover Story (involving claimed probable cause to stop and search the Trailblazer). We explained that the impetus for the change in the officers' story was the required disclosure to the defense of the officers' contemporaneous reports, which revealed that Mr. Sarnelli was arrested at gunpoint at the outset of a custodial encounter and therefore gave an unmirandized confession to the narcotics in his backpack immediately prior to Det. Johnson's claimed request for consent to search. We also promised to "establish at a suppression hearing that the true story of the prior warrants [obtained by the officers during their 18-month investigation of Mr. Sarnelli] is that the officers kept mining dry holes" and "[i]n frustration, they threw out the rule book on May 15 and seized Mr. Sarnelli at gunpoint in the hope of eliciting a confession or catching him with drugs." (ECF No. 38, Reply Br. at 13-14.)

Our defense theory was then powerfully corroborated by the government's Sur-Reply, in which the government disclosed for the first time, in a footnote, that two different Magistrate Judges had rejected the government's claim of probable cause to search Mr. Sarnelli's residence on May 3 and May 6, 2021—just days before the May 15, 2021 encounter on the LIE. (*See* ECF No. 43, Sur-Reply at 4 n.2.) Those two failed warrant applications were newly disclosed

evidence confirming the motive for the officers to fabricate the Traffic Stop Story to explain their actions on May 15 without the need to establish probable cause.

At the suppression hearing, however, Agent Dean sought to neutralize the failed warrants by testifying to an entirely new version of events, which we call the Order Form Story. Agent Dean for the first time claimed that an Operations Order Form that he authored on April 21, 2021 memorialized a standing authorization, obtained in consultation with the U.S. Attorney's Office, to arrest Mr. Sarnelli on a narcotics charge if Mr. Sarnelli were located within the next 30 days returning from Manhattan to Long Island, regardless of whether Mr. Sarnelli was found to be in possession of narcotics. (GX 217; Tr. 174-178, 240, 246-247.) Agent Dean described this standing authorization as "unique." (Tr. 246.) The April 21 timing allowed Agent Dean to claim his probable cause was already in place, vetted and approved by the U.S. Attorney's Office prior to the two failed warrant applications on May 3 and May 6.

The Order Form Story should not be relied on by this Court for the following five reasons.

**First**, it is inconsistent with Agent Dean's contemporaneous arrest report drafted on May 31, 2021, which stated: "The arrest of SARNELLI was carried out in light of evidence obtained on May 15, 2021, implicating SARNELLI in a narcotics conspiracy in violation of 21 U.S.C. § 846." (DX 11.) There is no mention in the report of an Operations Order Form or any pre-existing authorization from the U.S. Attorney's Office to arrest Mr. Sarnelli.

**Second**, Agent Dean's characterization of the Operations Order Form as memorializing a standing arrest authorization from the U.S. Attorney's Office is uncorroborated. The government produced as part of its 3500 materials for Agent Dean numerous email communications between him and Assistant U.S. Attorneys responsible for the investigation.

8

None of those communications corroborates Agent Dean's testimony that the U.S. Attorney's Office approved his Operations Order Form or otherwise authorized him to arrest Mr. Sarnelli prior to the May 17, 2021 email in which former AUSA Benjamin Schrier circulated a draft of the Complaint. (GX 208.) In the wake of Agent Dean's testimony, we wrote to the government requesting documentation evidencing approval from the U.S. Attorney's Office and were informed no such documentation has been located. Nor did Det. Johnson testify that he was aware of any pre-existing authorization from the U.S. Attorney's Office to arrest Mr. Sarnelli on May 15. In short, Agent Dean's word that the U.S. Attorney's Office authorized the arrest stands alone.

**Third**, Agent Dean's May 3, 2021 Operations Order Form is inconsistent with his testimony about the import of his April 21 Form. Agent Dean testified as follows in response to questions from the Court:

Q. Now, and that search warrant application [of May 3] was rejected by the magistrate?

A. Yes.

THE COURT: But if it had been granted, presumably you would have found Mr. Sarnelli at home?

THE WITNESS: I'm sorry, your Honor?

THE COURT: If you had gotten the search warrant for his home, would I be correct in assuming that you would have arrested him that day?

THE WITNESS: If he were there, yes.

THE COURT: If he were there.

THE WITNESS: If he were there, yes.

THE COURT: OK.

(Tr. 247-48.)  Your Honor wanted to know whether Agent Dean's plans on May 3 were consistent with his testimony that he had already secured approval to arrest Mr. Sarnelli as of April 21, and Agent Dean responded affirmatively.

However, Agent Dean's May 3, 2021 Operations Order Form contradicts his answers to the Court's questions.  In Section 10, Agent Dean wrote:

> All occupants of 38 THE HELM will be detained and questioned.  If narcotics and/or firearms are found during the course of the search of the premises, case agents will confer with AUSAs as to whether SARNELLI and/or other occupants of the premises will be taken into federal custody.

(3501-123 at 2.)[1]  Thus, Agent Dean's May 3 Form indicates that he did not plan to arrest Mr. Sarnelli during execution of the warrant unless narcotics (or a firearm) were found, and even upon such a finding case agents would confer with AUSAs before effecting such an arrest.  This passage of the May 3 Form, authored more closely in time to the events on the LIE than the April 21 Form, demonstrates that Agent Dean did not understand he had standing authorization from his superiors and from the U.S. Attorney's Office to arrest Mr. Sarnelli.  We have seen two versions of the May 3 Operations Order Form with this same language contradicting Agent Dean's answers to The Court's questions.[2]

**Fourth**, the Order Form Story is fundamentally at odds with the Complaint, which told the Traffic Stop Story.  Although he did not swear out the Complaint against Mr. Sarnelli, Agent Dean carefully reviewed the draft of the Complaint and made one subtle edit to suggest the backpack was in plain view even though it was not in the passenger compartment of the

---

[1]    We can provide copies of the 3500 documents to the Court if needed.

[2]    The two versions are 3501-123 and 3501-124.  The defense attempted to offer 3501-124 as a Defense Exhibit at the hearing, but the government incorrectly claimed it was already included in a Government Exhibit.  (Tr. 246.)

Trailblazer. (3501-059.) It simply makes no sense that an agent who had approval from his supervisors and the U.S. Attorney's Office to arrest Mr. Sarnelli, regardless of whether he was in possession of narcotics, would sign off on a Complaint telling a completely different story of stopping a vehicle for a traffic violation and arresting Mr. Sarnelli only after catching him with narcotics that he confessed were his. Indeed, the Complaint was not a one-off misdescription of the events of May 15, 2021. On May 2, 2022, Agent Dean swore to a search warrant application asking Your Honor for "a new probable cause determination," based entirely on a prior warrant application (attached as Exhibit A to Agent Dean's application) sworn to by Det. James Johnson, to search certain iCloud information on Mr. Sarnelli's phone. Det. Johnson's underlying warrant application told the Traffic Stop Story, as follows: "On or about May 15, 2021, Carmine Sarnelli, a/k/a 'Tony,' was arrested following a traffic stop where Sarnelli's backpack, which Sarnelli provided oral and written consent for law enforcement to search, contained" narcotics. (*See* 3501-067 ¶ 25, attaching 3502-055 ¶ 22.)

**Fifth**, Agent Dean's August 15, 2022 affidavit in opposition to our suppression motion likewise made no mention of the Order Form Story or any authorization in late April 2021 from the U.S. Attorney's Office to arrest Mr. Sarnelli. Nor did the government's brief in opposition to our suppression motion, filed that same day, mention the Order Form Story or any remotely similar arrest authorization.

In sum, Agent Dean's testimony regarding approval from the U.S. Attorney's Office is uncorroborated and at odds with the versions of events that he, Det. Johnson, and the AUSAs have espoused in various reports and filings in the 18 months preceding the suppression hearing. The Order Form Story conveniently neutralizes the major disclosure in the government's Sur-

11

Reply regarding the two failed warrant applications in early May 2021.  We ask the court to reject Agent Dean's account at the hearing as unreliable under all these circumstances.

**2.   The Government Did Not Have Probable Cause to Search Mr. Sarnelli's Backpack**

The government conducted a warrantless search of Mr. Sarnelli's backpack after stopping him in a vehicle on the Long Island Expressway.  The government argues that the officers were permitted to search the backpack pursuant to the automobile exception, which permits law enforcement to conduct a warrantless search of a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband.  *United States v. Ross*, 456 U.S. 798, 798 (1982).  Probable cause to believe a vehicle contains contraband permits officers to search the entire vehicle, including "passenger's belongings found in the car capable of concealing the object of the search."  *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999).  The government's theory of probable cause to believe that the vehicle contained contraband relies primarily on informants.[3]  To establish probable cause, an informant's information must be reliable, precise, and current.  *Illinois v. Gates*, 462 U.S. 213 (1983) (finding probable cause when an anonymous letter predicted the exact timing of when one defendant would drive to Florida and when another defendant would fly to Florida to meet the other).

Here, the government seeks to rely on four cooperating witnesses and confidential sources to establish that Mr. Sarnelli regularly purchased drugs in Manhattan: CW-1, CW-2, Bravo, and Sagan.  Of the four informants, only Bravo claims that he witnessed Mr. Sarnelli purchase drugs in Manhattan.  (Tr. 180; Johnson Aff., Ex. A at 26-27.)  CW-2 claims that she

---

[3]   Det. Johnson also testified that in May 2019, Mr. Sarnelli told law enforcement that he purchased a half pound of methamphetamine in "the city" for $2,200.  (Tr. 29.)  This information from two years before Mr. Sarnelli's May 15, 2021 arrest is clearly too dated to establish probable cause that he was resupplying in Manhattan at the time of his arrest.

traveled to Manhattan with Mr. Sarnelli to purchase drugs, but she never left the vehicle, and there is no evidence she ever witnessed a drug transaction take place.  (Tr. 39.)  CW-1 claims he traveled to Manhattan with Mr. Sarnelli during a failed attempt to purchase drugs (Tr. 140), and according to FBI source reports, Sagan only learned that Mr. Sarnelli traveled to Manhattan to purchase drugs from other sources.  (GX 119-21.)  The information provided by each of these informants is not sufficiently reliable, precise or current to establish probable cause.[4]

Bravo told Det. Johnson and Agent Dean that he traveled into Manhattan with Mr. Sarnelli around December 2019 to purchase drugs, accompanied Mr. Sarnelli in the hotel room and witnessed the transaction take place.  (Tr. 180; Johnson Aff., Ex. A at 26-27.)  This purported transaction—which is the only evidence that any of the informants witnessed Mr. Sarnelli purchasing drugs in Manhattan—occurred nearly a year and a half before Mr. Sarnelli was arrested on the LIE.

During the suppression hearing, both Det. Johnson and Agent Dean testified that Bravo also told them that he drove Mr. Sarnelli into Manhattan to purchase drugs around October 16, 2020, and this trip was corroborated by license plate reader ("LPR") hits on Bravo's car in Manhattan.  (Tr. 13-16, 181-82.)  To support the officers' testimony, the government submitted reports memorializing interviews between Bravo, Agent Dean and Det. Johnson on October 19, 2020 (GX 107-108) and LPR hits for Bravo's car (GX 901).  During the interviews with Agent Dean and Det. Johnson, Bravo never stated that he accompanied Mr. Sarnelli on a trip to Manhattan to purchase drugs during the week of October 12, 2020.  The defense has not seen a first-hand statement from Bravo stating that he traveled into Manhattan with Mr. Sarnelli the

---

[4]     Det. Johnson also testified that a fifth individual, Kevin Turner, provided information regarding Mr. Sarnelli in his post-arrest interview with law enforcement.  However, during the interview, Mr. Turner told police that he has never accompanied Mr. Sarnelli on a trip to Manhattan to buy drugs. (3522-088 at 19-20.)

week of October 12, 2020, and has only seen a second-hand recitation of the story by Det. Johnson in a search warrant application on November 13, 2020.  (GX 301 at 23-24.) Furthermore, the LPR reports of Bravo's car only show that Bravo was in Manhattan for at most thirty minutes—they do not establish that Mr. Sarnelli was with Bravo, and it is questionable whether a drug transaction could have been conducted during the brief period in which Bravo was in Manhattan.

Moreover, while Det. Johnson and Agent Dean were using Bravo as a confidential source, Bravo was accused of strangling and assaulting a woman and threatening a police officer on October 8, 2020.  (Tr. 137; 3519-028.)  Bravo had also previously spent time in prison for a homicide conviction.  (Tr. 138.)  Bravo's conduct undermined his credibility and led the government to stop using him as a confidential source.

CW-1 told officers that he traveled into Manhattan with Mr. Sarnelli around December 2019 to purchase drugs.  (Tr. 140; 3502-066 at 7.)  However, no sale was made, and there is no evidence that CW-1 ever witnessed Mr. Sarnelli purchase drugs in Manhattan.[5]  (Tr. 140.) Furthermore, Agent Dean testified that CW-1 told him that due to difficulties with procuring drugs from New York City in 2020 and 2021, Mr. Sarnelli began to receive shipments of crystal meth from Texas.[6]  (Tr. 251.)  CW-2 told officers that she traveled into Manhattan with Mr. Sarnelli around Christmas in December 2019 to purchase drugs.  (3502-066 at 8.)  However,

---

[5]    During the hearing, the Judge asked whether CW-1 and Mr. Sarnelli went into Manhattan together and both made purchases from a source at the same time.  (Tr. 37.)  Det. Johnson responded he had to review his notes to provide a response.  (Tr. 37.)  Based on the evidence provided by the government, CW-1 and Mr. Sarnelli never made purchases together from the same source in Manhattan.

[6]    Other informants testified to Mr. Sarnelli receiving drugs through shipment rather than by traveling into Manhattan.  During the hearing, the government submitted GX 109, a report memorializing an interview between Mr. Alex Asaro and Suffolk County Police Officer Kellie Burghardt in early 2020, as further corroboration that Mr. Sarnelli was trafficking drugs.  (Tr. 17-20.)  However, Mr. Asaro stated that Mr. Sarnelli got drugs delivered to his hotel room in Suffolk County, not by traveling into Manhattan.

14

CW-2 remained in the car during these trips to Manhattan and did not accompany Mr. Sarnelli to purchase drugs. (Tr. 39; 3502-066 at 8.)

Agent Dean and Det. Johnson also testified that probable cause was supported by Agent Dean confirming that Mr. Sarnelli resupplied during a May 1, 2021 trip to Manhattan. (Tr. 57-60, 207-208.) This is the only current information that supports the government's probable cause that Mr. Sarnelli was traveling back from Manhattan with drugs. However, this information was provided by Sagan, who was selling drugs while attempting to cooperate with the government, which led the government to stop using him as a source and two federal Magistrate Judges to deem him unreliable. (Tr. 48-49, 51-52.)

Less than two weeks before Mr. Sarnelli's arrest, the two Magistrate Judges denied warrant applications the government filed on May 3 and May 6, 2021, to search Mr. Sarnelli's residence at 38 The Helm for narcotics after Mr. Sarnelli returned from a trip to Manhattan. (Tr. 51-52; 3502-066; 3502-067.) Those warrant applications rely on much of the same information the government seeks to rely on here, including evidence that Mr. Sarnelli had traveled to Manhattan and information provided by Sagan and other informants.

In Det. Johnson's affidavit in support of the failed warrant applications, he stated that, based on GPS tracking, Mr. Sarnelli was in Manhattan on May 1, 2021, and then traveled back to 38 The Helm with a military style backpack, as shown through a surveillance video. He asserted, "I believe it is likely that, on May 1, 2021, SARNELLI traveled from the Subject Premise [38 The Helm] to one or more hotels in or around Midtown Manhattan, where he met with one or more sources for his narcotic trafficking; that at the foregoing meetings, SARNELLI obtained narcotics; and that SARNELLI thereafter used Bag-2 [the military-style backpack] to transport the narcotics back to the Subject Premises [38 The Helm], where he is currently storing

15

them." (3502-066 at 16-17; 3502-067.)  Crucially, in denying the warrant applications, both federal Magistrate Judges found that the government did not establish probable cause to believe there was evidence of narcotics trafficking inside 38 The Helm and that Sagan's new crimes diminished his credibility.  (Tr. 51.)

If the Magistrate Judges believed Mr. Sarnelli purchased drugs in Manhattan on May 1, 2021, they would have found there was probable cause to believe there were drugs at 38 The Helm, since Mr. Sarnelli went back to 38 The Helm after driving into Manhattan.  Consistent with the reasoning of the two Magistrate Judges, the Court should find that Mr. Sarnelli's trip to Manhattan on May 15, 2021, did not create probable cause to believe he had purchased drugs in Manhattan or that the Trailblazer contained drugs when Mr. Sarnelli was arrested.

### 3.  Mr. Sarnelli Did Not Consent to the Unlawful Search of His Backpack

The government must prove by a preponderance of the evidence that consent to search was freely and voluntarily given.  *Bumper v. N. Carolina*, 391 U.S. 543, 548 (1968); *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004).  Consent to search cannot "be coerced, by explicit or implicit means, by implied threat or covert force."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).  To establish voluntariness, the government must survive a fact-based inquiry "determined from the totality of all the circumstances."  *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir. 1980) (quoting *Schneckloth*, 412 U.S. at 227).  Here, the record demonstrates that Det. Johnson and Agent Dean did not obtain valid consent to search Mr. Sarnelli's backpack because they created a coercive environment through (i) intimidation, (ii) an illegal search and (iii) unmirandized questioning.

First, Det. Johnson and Agent Dean created a coercive environment from the outset of their encounter with Mr. Sarnelli.  While shouting orders, the officers rushed the car with guns

drawn and aimed at Mr. Sarnelli.  (Tr. 73-74.)  The officers then forcibly removed Mr. Sarnelli

from the car, handcuffed and arrested him and placed him in the back of Det. Johnson's car.  (Tr.

74-75, 113.)  Consent obtained while the suspect is under arrest, after such a show of force, has

been found involuntary.  S*ee United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973) (holding that

consent was not freely and voluntarily given where police stormed into an apartment with their

guns drawn, arrested the suspect before obtaining consent and did not advise her of her *Miranda*

rights).

Second, the officers returned to the car and performed an illegal search, which they

attempt to cast as a legitimate protective sweep.  (Tr. 77.)  The search, however, was

unconstitutional because it was not required to ensure officer safety.  Agent Dean had already

cleared the car of potential threats upon his initial approach.  (Tr. 221.)  When the officers

returned to the car after handcuffing Mr. Sarnelli and Ms. Caufield, they searched the vehicle in

an effort to find evidence supporting a narcotics conspiracy charge against Mr. Sarnelli in this

district.  Agent Dean testified that, upon returning to the vehicle, they began to open doors,

including the rear hatch access to the trunk, in order to more thoroughly search the vehicle.  (Tr.

224-225.)  Through that search, the officers discovered Mr. Sarnelli's backpack in the trunk.  (Tr.

225.)  Officers may not search for evidence under the guise of a protective sweep, particularly

when they subsequently seek consent to search.  *See United States v. Barone*, 721 F. Supp. 2d

261, 275 (S.D.N.Y. 2010) (suppressing evidence where police engaged in an unnecessary

protective sweep and exploited the fruit of that sweep to obtain consent).

Moreover, to conduct a protective sweep, officers must have a reasonable belief that the

suspect poses a danger based on "specific and articulable facts which, taken together with the

rational inferences from those facts, reasonably warrant the officers in believing that the suspect

17

is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).  In *United States v. Hussain*, the Second Circuit held that officers did not have an objectively reasonable fear of immediate danger to justify a car search despite the suspect being a member of an armed robbery crew, failing to initially comply with instructions, making suspicious movements towards the center console and having a knife on his person.  *See United States v. Hussain*, 835 F.3d 307, 314–15 (2d Cir. 2016).  Here, Mr. Sarnelli was not suspected of having committed violent crimes, officers had no intelligence suggesting Mr. Sarnelli or Ms. Caufield owned or carried weapons, Agent Dean did not see any weapons or dangers in the car when he cleared it on his initial approach and no weapons were found on Mr. Sarnelli or Ms. Caulfield.  (Tr. 76, 221-222.)  Accordingly, Det. Johnson and Agent Dean's intrusive search went beyond what the law permits to protect officer safety.

Third, Det. Johnson then used the fruits of the unlawful search to conduct a custodial interrogation of Mr. Sarnelli about the backpack's contents without providing required *Miranda* warnings.  (Tr. 79.)  Mr. Sarnelli denies giving verbal consent during the questioning, and Det. Johnson alone claims Mr. Sarnelli verbally consented to the search.  (Sarnelli Decl. ¶ 7.); (Tr. 79-80.)  Moreover, due to the search and Det. Johnson's comment that Ms. Caufield would get into trouble unless Mr. Sarnelli signed the form, Mr. Sarnelli believed the car and backpack had already been searched and that he was signing the consent form only to claim ownership of the backpack.  (Sarnelli Decl. ¶¶ 5, 7.)  His belief is fully supported and evidenced by his statements to Ms. Caulfield on June 11, 2021, that he "signed for everything," for which Ms. Caulfield thanked him (GX 601); *see also* (GX 602 at 2) ("I signed for the package and they let her go!"); (GX 603 at 2) ("I signed for that [expletive] package yo! to save your [expletive] ass!!!").

18

Because Det. Johnson and Agent Dean created a coercive environment, aided by an illegal search and un-*Mirandized* questioning, Mr. Sarnelli did not feely and voluntarily consent to the search of his backpack.  Accordingly, the evidence contained therein, and all fruits therefrom, must be suppressed.

### 4. The Inevitable Discovery Doctrine Does Not Apply to the Unlawful Search of Mr. Sarnelli's Backpack

Under the inevitable discovery doctrine, illegally obtained evidence will not be suppressed if the government can prove that the evidence would have been obtained inevitably. *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002) (citations omitted).  In response to questioning by the Court, Agent Dean testified that, following the May 15, 2021 stop of Ms. Caulfield's vehicle, it would have been more standard for the officers to take her vehicle back to the police station and do an inventory search, creating inevitable discovery—which was "ultimately what ended up happening." (Tr. 227.)  However, Agent Dean and Det. Johnson both testified that Ms. Caulfield was not placed under arrest in connection with the May 15, 2021 traffic stop.  (Tr. 94, 231.)  Rather, Ms. Caulfield and her vehicle were transported to the 5th Precinct only because Ms. Caulfield had agreed to give a more in-depth statement about the investigation.  (Tr. 94.)  Under these circumstances, the officers were not legally permitted to conduct an inventory search of Ms. Caulfield's vehicle.

An inventory search is "an incidental administrative step following arrest and preceding incarceration." *Illinois v. Lafayette*, 462 U.S. 640, 644 (1983).  Officers are permitted to conduct an inventory search when they "lawfully take personal property into their custody." *United States v. Cancel*, 167 F. Supp. 3d 584, 594-95 (S.D.N.Y. 2016).  For the government to rely on the inevitable discovery doctrine in connection with inventory search procedures, the government must prove by a preponderance of the evidence that (1) the police had legitimate

19

custody of the vehicle or other property being searched; (2) the police's inventory searches are conducted pursuant to established or standardized procedures; and (3) the inventory search procedures would have inevitably led to the discovery of the challenged evidence.  *See Mendez*, 315 F.3d at 138; *United States v. Scott*, No. 09 CR 331 (HB), 2009 WL 4975269 at *8 (S.D.N.Y. June 8, 2009); *United States v. Morillo*, No. 08 CR 676 (NGG), 2009 WL 3254431 at *8, 9 (E.D.N.Y. Oct. 9, 2009).  The government cannot invoke the inevitable discovery doctrine in connection with an inventory search of Ms. Caulfield's vehicle because Agent Dean and Det. Johnson did not place Ms. Caulfield under arrest, did not have legitimate custody of her vehicle, and never would have obtained legitimate custody of the contents within the vehicle had they not already discovered methamphetamine in Mr. Sarnelli's backpack.

## CONCLUSION

For the foregoing reasons, the Court should suppress the unlawfully obtained evidence from Mr. Sarnelli's backpack and any fruits therefrom.

Dated: December 5, 2022

Respectfully submitted,

   /s/ Christopher Gunther
      Christopher J. Gunther
      Brittany E. Libson
      Skadden, Arps, Slate, Meagher & Flom LLP
      One Manhattan West
      New York, NY 10001
      christopher.gunther@skadden.com
      brittany.libson@skadden.com

20