

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 19, 2022

**BY ECF**

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, N.Y. 10007

> **Re:** *United States v. Carmine Sarnelli*, **22 Cr. 116 (NRB)**

Dear Judge Buchwald:

The Government respectfully submits this letter in response to defendant Carmine Sarnelli's post-hearing brief in support of his motion to suppress. *See* ECF No. 48 ("Br."). As set forth below, the evidence at the suppression hearing established that, on May 15, 2021, law enforcement agents had ample probable cause to stop and search the SUV that Sarnelli was traveling in as he returned from yet another trip into Manhattan to pick up methamphetamine. Separately, unrebutted evidence at the hearing established that, once the SUV was stopped, Sarnelli calmly and voluntarily consented to a search of his backpack in the SUV, from which law enforcement recovered approximately one pound of methamphetamine, among other drugs. The stop and search of the SUV, and the arrest of Sarnelli, were thus entirely lawful.

Nevertheless, Sarnelli continues to rely on frivolous and debunked accusations about the subjective intent of the agents, an incomplete recitation of the record, and a fundamental misunderstanding of the limited purpose of charging instruments, affidavits, and law enforcement reports in criminal cases. The Court should reject these arguments and deny Sarnelli's motion.

## I.   Probable Cause Existed to Stop and Search the SUV

As set forth in the Government's opposition brief and sur-reply, which are incorporated by reference herein, a finding of probable cause requires only a "probability or substantial chance of criminal activity," not an actual showing of criminal activity. *See* ECF No. 33 at 18 (quoting *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990)). Under the "automobile exception," a vehicle may be searched without a warrant if law enforcement has probable cause to believe that the vehicle contains contraband or evidence of a crime. *See United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004). Moreover, the analysis of whether a search was lawful under the Fourth Amendment focuses solely on the objective facts available to law enforcement at the time, not the subject intent or belief of the agents executing the search. *See United States v. Weaver*, 9 F.4th 129, 145 (2d Cir. 2021) ("The Supreme Court has long rejected any attempt to

Page 2

inject subjectivity into the Fourth Amendment context."). The evidence at the hearing established that probable cause supported the agents' stop and search of the SUV, and their arrest of Sarnelli.

To start, it cannot be seriously disputed that Sarnelli was a drug dealer. The Court recognized as much at the hearing, *see* Tr. at 24-25, and the evidence overwhelmingly established that point. The agents testified that, during the course of the investigation, numerous witnesses identified Sarnelli as a methamphetamine trafficker. *See, e.g.*, Tr. at 8-9, 20, 35, 38-39, 43, 46. Sarnelli himself gave a post-arrest statement to local law enforcement in May 2019, during which he admitted to being a drug dealer who got methamphetamine from Manhattan after he was arrested with a large quantity of methamphetamine in a hotel room. *See* GX 117, 117A. Sarnelli's Facebook communications showed that he was still selling methamphetamine in or around March 2021. *See* GX 215, 703, 704; Tr. at 203-206. And law enforcement conducted multiple controlled buys of methamphetamine from Sarnelli in the months leading up to his arrest, including a completed purchase as recently as April 27, 2021, and an attempted purchase on May 12, 2021, that only fell through because Sarnelli was upset that the confidential informant brought someone along to the deal. *See* GX 118, 122, 123, 223. Accordingly, there was abundant proof that Sarnelli was continuing to sell methamphetamine in the weeks and days leading up to his arrest.

The question before the Court thus boils down to whether there was probable cause to believe that Sarnelli, a known drug dealer, was traveling back from Manhattan in the SUV with methamphetamine on May 15, 2021. If so, then the stop and search of the SUV were justified, and Sarnelli's motion must be denied.

This is not a close call. From the start of the investigation, and up through Sarnelli's arrest, witnesses consistently told the agents that Sarnelli purchased large quantities of methamphetamine in midtown Manhattan, which he then resold in Long Island. Law enforcement also learned that Sarnelli's girlfriend, Kara Caulfield, was complicit in Sarnelli's drug dealing and sometimes went with him to Manhattan to pick up methamphetamine. Independent evidence—including statements from other witnesses, GPS data, license plate reader information, physical and video surveillance, and social media records—corroborated these accounts, as did Sarnelli's *own admissions* to police. For example:

- In May 2019, Sarnelli was arrested with a large quantity of methamphetamine at a hotel in Long Island. During his post-arrest statement, Sarnelli admitted that he had been selling methamphetamine for "about the last four months" and that, before his arrest, he had purchased "a half pound of meth in the city for $2,200." GX 117, 117A.

- In December 2019, a confidential informant, Bravo, told the agents that Sarnelli "would travel into Manhattan and obtain large quantities of methamphetamine to then resell on Long Island." Tr. at 9; *see also* GX 101 at 3 (noting that Bravo had previously driven Sarnelli to meet up with Sarnelli's supplier in a hotel room near Times Square, where Bravo observed a "mountain of meth.").

- In January and February 2020, Bravo told the agents that Sarnelli continued to pick up methamphetamine in Manhattan from a supplier known to Bravo as "John." *See* GX 102, 103; Tr. at 180.

Page 3

- In mid-October 2020, Bravo told the agents that he had just driven Sarnelli into midtown Manhattan to pick up methamphetamine, and that he had seen the methamphetamine that Sarnelli purchased on that trip, which was stored in zip-lock bags. *See* Tr. at 181-183. License plate reader information corroborated that Bravo had driven Sarnelli into Manhattan in the early morning hours of October 16, 2020. *See* GX 901 at 2.

- In mid-December 2020, based on a warrant for cellphone GPS location data, the agents observed that Sarnelli's cellphone had traveled into midtown Manhattan and then back to Long Island, corroborating "several reports that [the agents] had gotten from various sources that Mr. Sarnelli frequented the midtown Manhattan area to reup crystal methamphetamine." *See* GX 211; Tr. at 185. On January 4, 2021, law enforcement then conducted a controlled purchase of methamphetamine from Sarnelli. *See* GX 118.

- In late January 2021, CW-1 and CW-2 were arrested and thereafter began proffering with the Government. During those proffers, which occurred in the months leading up to Sarnelli's arrest, CW-1 and CW-2 told the agents that Sarnelli picked up methamphetamine in midtown Manhattan for resale on Long Island. Indeed, both CW-1 and CW-2 had previously accompanied Sarnelli into Manhattan for this purpose at the end of 2019 and the beginning of 2020, and CW-1 also had conversations with Sarnelli about a Manhattan-based supplier. *See* Tr. at 192-194.

- In early February 2021, another confidential informant, Sagan, told the agents that Caulfield often drove Sarnelli to pick up methamphetamine and that she had driven Sarnelli into Manhattan to resupply as recently as January 25, 2021, after which they brought the methamphetamine back to Suffolk County. *See* GX 119.[1]

- In mid-March 2021, Sagan told the agents that he had recently visited Sarnelli at 38 The Helm, a residence where Sarnelli was staying ("The Helm"). During the visit, Sagan observed a large quantity of methamphetamine, and Sarnelli told Sagan, in sum and substance, that he was "picking up crystal methamphetamine from about four or five different people in New York City." GX 120 at 2. Shortly thereafter, on March 18, 2021, Sagan participated in a controlled purchase of methamphetamine from Sarnelli. *See* GX 122.

- A couple of days later, on or about March 20, 2021, Sarnelli's cellphone was once again pinging in midtown Manhattan. Around that same time, Caulfield posted a photograph

---

[1] Sagan also told the agents that Sarnelli and Caulfield were "freaked out" by the recent arrests of CW-1 and CW-2, and were trying to figure out who had been acting as an informant. Tr. at 43; GX 119. Around this same time, another confidential informant, Scarlet, who previously conducted a controlled purchase from Sarnelli, *see* GX 118, told the agents that Sarnelli was "laying low" following the FBI arrests of CW-1 and CW-2, because Sarnelli was worried that one of them would mention his name. *See* GX 125 at 2.

Page 4

on Facebook with a location tag of "Lexington Avenue, Manhattan" and showing the top of a clear zip-lock bag, which was consistent with the agents' understanding from witness interviews that Sarnelli would "store methamphetamine and pick up methamphetamine in Ziploc bags." *See* GX 218; Tr. at 196-197; *see also* GX 121 at 1.

- On March 29, 2021, Sagan (at law enforcement's direction and wearing recording devices) tried to conduct another controlled purchase from Sarnelli.  Sarnelli arrived with Caulfield in the SUV, smoked methamphetamine in front of Sagan, and discussed selling methamphetamine to Sagan. Caulfield also provided the current market prices for methamphetamine.  Ultimately, however, that sale did not go through because they did not have a scale with which to weigh the methamphetamine.  *See* GX 310 at 8-9.

- On March 31, 2021, the agents obtained a judicially authorized tracker warrant for the SUV, based on facts establishing probable cause to believe that Sarnelli was using the SUV in furtherance of narcotics trafficking offenses.  *See* GX 310 at 9-10.

- On April 27, 2021, Sagan conducted another controlled purchase of methamphetamine from Sarnelli.  *See* GX 123.  Around that time, Sagan also told the agents that Sarnelli continued to engage in methamphetamine trafficking.  *See* GX 121.

- On May 1, 2021, the agents observed that Sarnelli's phone was once again pinging in midtown Manhattan.  *See* Tr. 57, 207-208; GX 803-805.  Video surveillance then showed Sarnelli returning to The Helm in an Uber with his phone and a military-style backpack, consistent with information the agents had received about Sarnelli keeping drugs in that sort of backpack.  *See* GX 206, 206A; Tr. at 59.  Sagan then told the agents that Sarnelli had just resupplied with methamphetamine in Manhattan.  *See* Tr. at 208.

- On May 12, 2021, law enforcement, through Sagan, attempted to conduct another controlled purchase into Sarnelli.  Sarnelli called off the sale at the last minute, however, because he was upset that Sagan had brought another person.  At that time, agents surveilling the attempted transaction observed Caulfield in the driver seat of the SUV, speaking with Sarnelli.  *See* GX 223.  This further corroborated information the agents had received that Caulfield "was an associate of Mr. Sarnelli's and also drove for him sometimes to pick up and reup methamphetamine supply."  Tr. at 213.

- On May 15, 2021, Sarnelli's phone was once again pinging in midtown Manhattan, starting at around 2:00 a.m.   *See* GX 207, 807.  License plate reader information showed that the SUV was also in midtown Manhattan around that time.  *See* GX 207; *see also* GX 806-808.  This was significant, because it indicated to the agents, based on their investigation to date, that "Sarnelli was likely being resupplied with methamphetamine" and that Sarnelli "was likely in Manhattan with Kara Caulfield and driving in her vehicle."  Tr. at 214-215.  The GPS data for Sarnelli's cellphone then showed him returning to Suffolk County on the Long Island Expressway ("LIE"), and the agents observed the SUV traveling eastbound on the LIE shortly thereafter, consistent with the cellphone GPS data.  *See id*. at 216, 219; GX 808.

Page 5

Based on the foregoing, when the agents observed the SUV traveling back from Manhattan on May 15, 2021, they had ample probable cause to believe that evidence of a crime—namely, methamphetamine—would be found in the SUV. Indeed, throughout months of investigation, the agents had received consistent and corroborated information that Sarnelli resupplied in Manhattan, that he had done so as recently as two weeks prior to his arrest, and that the SUV was being used in furtherance of Sarnelli's narcotics trafficking. The agents were thus entirely justified in stopping the SUV on its way back from Manhattan and searching it for narcotics.

Moreover, even setting aside whether the agents had probable cause to believe that Sarnelli was being re-supplied in Manhattan (which they did), the GPS location data for Sarnelli's cellphones clearly showed that he was traveling in the SUV with at least one of his cellphones. This alone provided independent probable cause for the stop and search the SUV, and any containers therein, for Sarnelli's cellphones. *See, e.g.*, *United States v. Bustos-Andrade*, 2017 WL 6729901, at *5 (D. Md. Dec. 29, 2017) (finding that the automobile exception justified the search of a vehicle where officers "could reasonably believe that evidence of a crime would be found in the vehicle, namely the cellphone that [the defendant] used in connection with [a] methamphetamine delivery"). Sarnelli was clearly using his cellphones to engage in drug dealing, as reflected by the multiple GPS location warrants for Sarnelli's cellphones that were authorized by federal magistrate judges, including one as recently as May 12, 2021. *See* GX 302, 304, 305, 307, 308. Under the automobile exception, if the agents had probable cause to believe that any of Sarnelli's cellphones—which were instrumentalities of the crime and were likely to contain evidence of Sarnelli's drug dealing—were in the SUV, then they were justified in stopping the SUV and searching its contents for those phones, including in Sarnelli's backpack (where approximately one pound of methamphetamine and one of Sarnelli's cellphones was found). *See* Det. Johnson Aff., ECF No. 34-6, at ¶¶ 7(a), 9(a).

Sarnelli's only arguments against probable cause are that the information that the agents received was unreliable and stale. Both of these arguments fail.

With respect to reliability, Sarnelli goes to great lengths to argue that various witnesses' reports about his source of supply in Manhattan were unreliable, uncorroborated, or based on second-hand knowledge. *See* Br. at 12-14. That is absurd. To start, Sarnelli conveniently leaves out that *he admitted* to law enforcement officers in May 2019 that he was a drug dealer who purchased his supply of methamphetamine in Manhattan. *See* GX 117, 117A. That admission provided important context because when other witnesses spoke of Sarnelli getting methamphetamine from Manhattan, they were confirming what Sarnelli had already said. Sarnelli also addresses each witness in a vacuum, ignoring the powerful cross-corroboration among witnesses. This is not a case of one tipster with limited information. The agents heard consistent information about Sarnelli's drug dealing and his trips to Manhattan from a litany of witnesses throughout several months, including from people who (i) sold drugs with Sarnelli; (ii) drove Sarnelli into Manhattan to pick up methamphetamine, (iii) spoke to Sarnelli about his Manhattan suppliers, and (iv) purchased methamphetamine from Sarnelli after he re-upped in Manhattan. Those witnesses corroborated one another, and were corroborated by, among other things,

Page 6

controlled purchases, cellphone location data, Facebook photographs, and license-plate-reader records.[2]

Sarnelli also ignores the reality that, on the day of his May 2021 arrest, Caufield confirmed everything that witnesses had told the agents throughout the investigation. Among other things, Caulfield confirmed that she had driven Sarnelli into Manhattan to pick up methamphetamine on the day of his arrest, that Sarnelli picked up methamphetamine from a Manhattan supplier "approximately once per month," and that (consistent with Sagan's information) Sarnelli had gone into Manhattan two weeks earlier to purchase two pounds of methamphetamine. *See* GX 126.[3]

Sarnelli also half-heartedly argues that information about his Manhattan-based source of supply was stale. *See* Br. at 13. In doing so, Sarnelli ignores well-established law concerning staleness in the context of narcotics conspiracies, which recognizes that "narcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness." *United States v. Rowell*, 903 F.2d 899 (2d Cir. 1990) (holding that an 18-month delay between receiving information and applying for a wiretap warrant did not make the information stale); *United States v. Gayle*, 8 Cr. 1244 (RWS), 2009 WL 4667093, at *3 (S.D.N.Y. Dec. 8, 2009) ("[C]ourts in the Second Circuit have found probable cause to remain current in narcotics cases when the gap between the most recent information and the search was substantial."); *see also United States v. Singh*, 390 F.3d 168, 182-83 (2d Cir. 2004) (a lapse of more than 20 months between the last occurrence of facts relied on and the issuance of a warrant was not stale, because the information provided by the informant indicated fraudulent activity of an ongoing and long-term nature).

Here, the agents had strong and reliable information that Sarnelli had a lengthy history of obtaining methamphetamine from Manhattan. *See United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988) (holding that when there is "continuing conduct" instead of "an isolated incident of wrongdoing," the "passage of time . . . becomes less significant"). As described above, starting in late 2019, and through the date of Sarnelli's arrest, the agents continued to receive information

---

[2] Sarnelli also argues that information provided by Bravo and Sagan was unreliable because their attempted cooperation with law enforcement ended due to non-compliance. *See* Br. at 14, 15. The agents testified at the hearing, however, that despite these violations, they never had any reason to doubt the veracity of the information that Bravo and Sagan provided about Sarnelli, which, as described above, was corroborated by other independent evidence. *See* Tr. at 17, 199-200. Sarnelli separately attempts to cast doubt on Sagan's reliability by pointing to the denial of The Helm warrant applications, which cited information provided by Sagan, *see* Br. at 15, while ignoring entirely a subsequent cellphone location warrant, likewise containing information provided by Sagan, that was signed by a magistrate judge in this District on May 12, 2021. *See* GX 308.

[3] Indeed, six days prior to Sarnelli's arrest, Caulfield told an SCPD detective, in sum and substance, that Sarnelli "picks up major weight of crystal meth in New York City and that he was planning on reupping soon by the same." GX 224. While the case agents were unaware of this statement at the time of Sarnelli's arrest, it further undermines Sarnelli's current attempt to attack the credibility of the witnesses the agents relied upon during the investigation.

Page 7

that led them to believe that Sarnelli re-supplied in Manhattan. The agents also received information confirming that this practice was continuing shortly before the stop.[4] Indeed, in March 2021, Sarnelli told Sagan that he was picking up from "four or five different people in New York City." GX 120 at 2. In the approximately two weeks leading up to Sarnelli's arrest, the agents observed Sarnelli's cellphone pinging in midtown Manhattan, learned that Sarnelli had recently re-supplied in Manhattan, and conducted a controlled purchase of methamphetamine from Sarnelli. Those recent events, together with the information they had learned throughout the investigation, gave the agents reason to believe that Sarnelli was making another run into Manhattan to resupply on May 15, 2021.

Accordingly, probable cause existed to stop and search the SUV, and to arrest Sarnelli.

## II.    The Agents Obtained Valid Consent to Search the SUV and Backpack

In addition to having probable cause to search the SUV and Sarnelli's backpack, the agents also obtained written consent from both Caulfield and Sarnelli. As the agents testified, obtaining that consent was not necessary, but was nonetheless a common and valid law enforcement tool for smoothing the search process. *See* Tr. at 81, 226. Caulfield's and Sarnelli's consents were uncoerced, so they were separate, valid grounds for searching the SUV.

To begin, the question whether Caulfield and Sarnelli gave valid consent, and whether the agents could rely on their statements about what was in the SUV, is distinct from the question whether a *Miranda* warning was required. The Fifth Amendment bars introduction in court of "a criminal defendant['s] out-of-court statement obtained by compulsion." *Vega v. Tekoh*, 142 S. Ct. 2095, 2101 (2022). *Miranda* imposes "prophylactic rules" designed to protect the Fifth Amendment, but "a violation of *Miranda*" is not a *per se* "violation of the Fifth Amendment." *Id.* at 2101-03; *accord Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985) (holding that *Miranda* "sweeps more broadly than the Fifth Amendment" because it also excludes "voluntary" statements).

Consistent with that legal background, the Supreme Court and Second Circuit have held that "failure to give a *Miranda* warning does not require suppression of physical evidence discovered as a consequence of unwarned statements." *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010) (citing *United States v. Patane*, 542 U.S. 630 (2004)). "Every federal circuit court that has addressed the issue" has also held that a "consent to search is not an incriminating statement" subject to *Miranda* requirements. *United States v. Rodriguez-Garcia*, 983 F.3d 1563, 1568 (10th Cir. 1993) (collecting cases); *accord United States v. St. Claire*, 4 Cr. 147 (LTS), 2005 WL 736236, at *4 (S.D.N.Y. Mar. 30, 2005) (collecting cases in this District).

The upshot of these legal rules, which Sarnelli ignores, is that the fact that Sarnelli and Caulfield were not read *Miranda* rights before they signed consent forms does not render their consents invalid, and did not prevent the officers from relying on those consents and statements. So long as the consents and statements were voluntary, they were a lawful basis for further investigation.

---

[4] Sarnelli points out that he also received methamphetamine in the mail. *See* Br. at 14. That Sarnelli may have had multiple ways to get drugs is immaterial: witnesses consistently said that Sarnelli re-supplied in Manhattan, and independent evidence corroborated those statements.

Page 8

The evidence at the hearing overwhelmingly established that Sarnelli and Caulfield gave voluntary consent to search. Start with Sarnelli. While agents initially drew their weapons to approach the SUV, they quickly put those weapons away once Sarnelli and Caulfield complied with their commands. Tr. at 74. Sarnelli was then moved to Det. Johnson's car, where he gave both verbal consent and signed a written consent form, a portion of which he read aloud to Det. Johnson, and which expressly acknowledged that consent was provided "voluntarily and without threats or promises of any kind." GX 124; Tr. at 80-84. During this exchange, Sarnelli was calm and polite, and he acknowledged that he understood the nature of his consent to Det. Johnson after reading the consent form "a couple of times to himself." Tr. at 80, 84. Officer Coyne, who also signed Sarnelli's consent form as a witness, corroborated Det. Johnson's observation that Sarnelli was calm and cooperative. Tr. at 170. Months later, and well before this motion was filed, Sarnelli admitted multiple times in jail calls and text messages that he "signed for everything"—that is, that he voluntarily consented to the search of his backpack. GX 601, 602, 603.

Caulfield also voluntarily consented to a search of the full SUV. After leaving the SUV, Caulfield was taken to Officer Coyne's vehicle. Tr. at 224. Like Sarnelli, she gave both verbal and written consent to search the SUV. Tr. at 225. This was a separate, lawful basis for the agents to search the SUV, where they promptly found the backpack that Sarnelli used to transport narcotics. Tr. at 228.

Largely ignoring the evidence at the hearing, Sarnelli asserts that his consent was neither knowing nor voluntary and instead the product of intimidation, an illegal search, and un-*Mirandized* questioning. *See* Br. at 16. Sarnelli's arguments are easily dismissed.

Two legal principles go a long way toward undermining Sarnelli's claim. First, proving that consent was involuntary is exceptionally difficult. Involuntariness requires a showing of coercion, which the Second Circuit has typically only found in cases involving "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation." *United States v. Verdugo*, 617 F.3d 565, 575 (2d Cir. 2010) (collecting cases). The Second Circuit has consistently rejected the argument that consent or a statement was involuntary simply because police drew firearms to effectuate an arrest and the arrestee was, at one point, handcuffed. *See, e.g.*, *id.* at 574-75 (finding statement voluntary despite arrest with drawn guns); *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (same in consent context); *United States v. Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990) (same); *United States v. Crespo*, 834 F.2d 267, 269-71 (2d Cir. 1987) (same). The lone decision Sarnelli cites to is altogether different: the agents in that case broke down a door to the defendant's apartment at 2 o'clock in the morning and almost immediately demanded consent with guns still drawn. *United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973).

Second, Sarnelli elected not to testify and face cross-examination. His affidavit, then, merits little weight, particularly when evaluated against the testimony of the agents who took the stand. *See United States v. Yong Wang,* No. 11 Cr. 730 (PGG), 2013 WL 452215, at *7 (S.D.N.Y. Feb. 5, 2013) (collecting cases affording greater weight to testimony subject to cross examination); *United States v. Peña Ontiveros*, 547 F. Supp. 2d 323, 333 (S.D.N.Y. 2008) (crediting agents' testimony and rejecting defendants' affidavits that were not subject to cross-examination)*; United States v. Al–Marri*, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002) ("[T]his Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to [defendant's] version of the facts.").

Page 9

With those rules in mind, there is little merit to Sarnelli's claim that his consent was involuntary. Sarnelli's characterization of the circumstances under which he gave consent are unsupported by the record. True, the agents approached the SUV with weapons drawn, but they put those weapons away before removing Sarnelli and Caulfield from the SUV. Tr. at 73-74. Sarnelli did not sign the consent form until later, after having a calm conversation with Det. Johnson and an opportunity to read the form, of which he availed himself. Tr. at 80-85.

Sarnelli's claim that the agents used the "fruits of [an] unlawful search" to obtain his consent, Br. at 18, is also doubly wrong. For one, the agents did not perform an unlawful search. The agents testified that they performed a cursory sweep of the SUV to ensure there were no other individuals inside the vehicle or weapons in plain view. Tr. at 78, 224-225. Walking around the SUV to determine whether objects in plain view posed a risk to officer safety is a far cry from "search[ing] the vehicle in an effort to find evidence supporting a narcotics conspiracy charge against Mr. Sarnelli." Br. at 17.[5] The agents, moreover, did not use the "fruits of an unlawful search" to obtain Sarnelli's consent. Br. at 18. It is Sarnelli alone who claims that Det. Johnson mentioned the backpack to him before he consented to a search. Det. Johnson and Special Agent Dean, by contrast, both testified that Sarnelli raised the backpack shortly after he was removed from the SUV. Tr. at 79, 223. Because Sarnelli did not testify, it is entirely proper to credit consistent law enforcement testimony that was subject to cross-examination over the untested and uncorroborated self-serving allegations in Sarnelli's declaration.

Finally, Sarnelli does not raise any argument undermining the validity of Caulfield's consent, which provided an independent basis for the agents to search the SUV. That consent justified the agents conducting a full search of the vehicle, including Sarnelli's backpack, because the scope of the consent allowed them to do so; because prior information about Sarnelli's backpack gave the agents probable cause to believe it would contain drugs once they saw it; and because the agents had a separate basis to search the backpack for Sarnelli's phones, which they had probable cause to believe would contain evidence of his drug trafficking.

In short, while the agents did not need consent to search the SUV and the backpack because they had probable cause, the consents gave them a separate, independently lawful basis to do so.

### III.  The Agents Have Been Consistent in Their Accounts of Sarnelli's Arrest

In his post-hearing brief, Sarnelli doubles down on his baseless claim that the agents have not been consistent about their reasons for stopping and searching the SUV, now claiming that Special Agent Dean added a new "Order Form Story" to the mix. The argument was not true before the hearing, it is not true now, and the suggestion that Special Agent Dean created a new "Order Form Story" is a frivolous attack on an agent who testified credibly about his role in the investigation. In court filings, internal documents, and hearing testimony, the agents have been steadfast in their description of the events leading up to and justifying the stop, search, and arrest.

Sarnelli's post-hearing brief highlights a continued sloppiness with facts and accusations that betrays the desperation in Sarnelli's attempt to distract from the powerful evidence against

---

[5] Sarnelli's backpack was not opened during this sweep, rather it was only searched after the consent forms were signed by both Sarnelli and Caulfield. *See* Tr. at 90, 128, 227-28.

Page 10

him.[6]  Sarnelli opens by claiming that "the government's primary contention at the hearing" was a "new theory" about an FBI operations order (the "Operations Order") approving Sarnelli's arrest. Br. at 1.  That is transparently wrong.  The Government's focus at the hearing, as it has been throughout these proceedings, was that probable cause supported the stop and search of the SUV. The Operations Order was one additional piece of evidence proving that was the case and rebutting the claim—which featured prominently in Sarnelli's earlier briefing—that the agents did not believe there was probable cause to stop and search the SUV or to arrest Sarnelli.  Sarnelli also says the Government "expand[ed] the factual basis for probable cause" to conduct a stop and search, Br. at 1, putting a nefarious-sounding gloss on the normal process of introducing testimony and exhibits.  Laying out the full factual record is the point of a hearing.  The Government offered, and the agents testified to, an extensive factual record showing that Sarnelli was a large-scale methamphetamine trafficker who obtained drugs from Manhattan, because that was the truth about what the agents learned during their investigation.

Contrary to Sarnelli's growing list of supposed "stories," the agents have consistently maintained that their extensive investigation revealed probable cause to stop and search the SUV. Start with Sarnelli's claim that the agents "migrated from a Traffic Stop Story . . . to a Cover Story."  Br. at 7.  The hearing confirmed that each aspect of Sarnelli's accusations was wrong. There was no concocted "Traffic Stop Story."  The Complaint explained that there was probable cause to believe that Sarnelli was a methamphetamine dealer who got drugs in Manhattan, *see* Compl. ¶¶ 5(a)-(e), and the hearing bore out the mountain of evidence in support of that position. To be sure, the Complaint also noted the presence of a traffic violation because there was one: Det. Johnson and Special Agent Dean both credibly testified about a facemask in the car's front windshield before the stop.  *See* Tr. at 69, 95, 136, 220.  Including that in the Complaint was appropriate even if it was not the reason for stopping the SUV because the propriety of a stop is based on an objective, not a subjective standard.  *See, e.g.*, *Weaver*, 9 F.4th at 145.  In any event, the record is clear that this observation was, plainly, not part of an effort to conceal a perceived lack of probable cause.

The hearing also revealed that Sarnelli's so-called "Cover Story" was a fiction of his own imagination.  In the imaginary world of Sarnelli's briefs, Sarnelli filed an affidavit and the agents scrambled to come up with a new explanation for the stop.  ECF No. 38 at 2-4.  In reality, the agents never saw Sarnelli's affidavit, briefing, or motion before submitting affidavits in this case. *See* Tr. at 103-105, 238-239.  Their affidavits provided additional information about their investigation and the stop.  And those affidavits were consistent with the hearing testimony, in which the agents gave more detail about their extensive investigation and well-founded reasons to believe that Sarnelli was a methamphetamine trafficker who picked up drugs from Manhattan, as well as the reasons for and events surrounding the stop during which he was arrested.  In sum, Sarnelli's "Cover Story" is just a false, but convenient, label for his briefing.

Sarnelli's new narrative—called the "Order Form Story"—is just as outlandish.  The Operations Order was powerful corroboration that the agents believed they had probable cause to arrest Sarnelli and, therefore, had no need to invent the "Traffic Stop Story" or "Cover Story."  As

---

[6] Indeed, Sarnelli's post-hearing brief also contains multiple citations to 3500 material that was not received in evidence and which Sarnelli had ample opportunity to use for cross-examination at the hearing.

Page 11

Special Agent Dean testified, in April 2021 he prepared a plan to arrest Sarnelli, which he memorialized in an Operations Order that was approved by FBI supervisors. *See* Tr. 173-78; GX 217. The Operations Order called for monitoring Sarnelli until he was returning to Long Island from Manhattan (where he obtained narcotics), then stopping and apprehending him. *See* GX 217 at 3. That plan made complete sense: the agents knew that Sarnelli got his methamphetamine from Manhattan, and so wanted to stop and arrest Sarnelli on his way back from Manhattan, when he was likely going to be in possession of a substantial quantity of narcotics. *See* Tr. at 216. To no one's surprise, that is precisely what happened. The arrest went forward along the same lines as in the Operations Order, which is strong evidence that the agents did not, as Sarnelli speculates, arrest Sarnelli on a lark then try to justify it to prosecutors and the Court after the fact.

Twisting the facts, Sarnelli claims that Special Agent Dean's testimony about the Operations Order was really a "new version of events" designed to "neutralize" the fact that the agents had unsuccessfully applied for warrants to search a residence at which Sarnelli was staying. Br. at 7-8. That is frivolous. For one, there was nothing to "neutralize." The Judges who denied the warrants said there was probable cause to believe Sarnelli was a drug dealer, and a Magistrate Judge in the Southern District of New York subsequently approved a renewed warrant to obtain cellphone location data from one of Sarnelli's cellphones—*three days before Sarnelli's arrest*. Tr. at 51; GX 308. The denial of prior warrants to search a particular residence did not undermine the premise for the arrest plan set forth in the Operations Order: that Sarnelli was a drug dealer who got his drugs from Manhattan. Moreover, the idea that the Operations Order is a "new version of events," Br. at 8, is preposterous. There is no plausible basis to claim that the Operations Order—which was prepared almost a month before the arrest—is not authentic. And it is based on the same basic reality that was in the Complaint, the affidavits, and the hearing testimony: there was probable cause to stop and search the SUV, and to arrest Sarnelli, coming from Manhattan because that is where Sarnelli got his methamphetamine.

Sarnelli's arguments for disregarding the Operations Order are inconsistent with the record and common sense. He first claims that the Operations Order is at odds with the FBI's arrest report, which references the drugs found during the stop. Br. at 8. But as Special Agent Dean explained, that does not mean the drugs were the sole basis for the arrest; FBI agents, understandably, do not "memorialize exhaustive details of . . . prior investigative action" in arrest reports. Tr. 241-42. Sarnelli's objection that there is no documented approval from the U.S. Attorney's Office for the Operations Order is similarly misplaced. The Operations Order is an FBI form, and Special Agent Dean testified that approval had to come from his supervisors at the FBI, not the U.S. Attorney's Office. Tr. 174. Special Agent Dean also testified that he would not have proceeded without "consult[ing] with the U.S. Attorney's Office," Tr. at 175, and it is entirely reasonable that the consultation would have occurred without written documentation, let alone in a formal document or email.

Next, Sarnelli points to a different operations order, dated May 3, 2021 (the "May 3 Order"), related to an anticipated search of The Helm claiming that a portion of the May 3 Order undercuts the premise that the agents had authorization to arrest Sarnelli. *See* Br. at 9-10. The May 3 Order that Sarnelli cites related to a search of a premises where agents expected to find multiple people, some of whom might, or might not, be subject to federal charges. Br. at 10. Accordingly, the sentence addressing possible arrests noted that law enforcement officers would consult with prosecutors before making arrests. *Id.* That does not undermine the existing authority

Page 12

from the Operations Order that allowed the agents to arrest Sarnelli as he returned from Manhattan and was "in effect for 30 days" from its issuance on April 21, 2021.  *See* GX 217 at 3.

Sarnelli's final claim—that the Operations Order is inconsistent with the Complaint and Special Agent Dean's affidavit, *see* Br. at 10-11—is also grasping at straws.  The argument that there was an inconsistency between the Operations Order and Complaint is based on the faulty premise that the Complaint says the sole reason for the stop was a traffic violation.  As explained above, and is obvious from the text of the Complaint, that is false.  Both the Operations Order and the Complaint describe a lengthy investigation into Sarnelli, culminating in his stop and arrest.  The claim that the Operations Order should be ignored because it was not mentioned in Special Agent Dean's affidavit is frivolous, too.  The affidavit summarized some of the facts supporting probable cause and the events surrounding Sarnelli's arrest; it was not an exhaustive recitation of every investigative step and piece of paperwork.  There is thus no plausible basis for claiming that the Operations Order is anything other than a real reflection of the agents' plans to stop and arrest Sarnelli on his way back from Manhattan.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should deny Sarnelli's motion to suppress.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/
Thomas S. Burnett
Emily A. Johnson
David J. Robles
Assistant United States Attorneys