UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
UNITED STATES OF AMERICA,

      - against -

CARMINE SARNELLI,             **MEMORANDUM AND ORDER**
a/k/a "Tony,"

                     22 CR 116 (NRB)

            Defendant.
---------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      Defendant Carmine Sarnelli ("defendant" or "Sarnelli") has been charged in a two-count indictment (the "Indictment"). ECF No. 15. Count One of the Indictment ("Count One") charges Sarnelli with conspiring to distribute and possessing with intent to distribute 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, the use of which resulted in the death of an individual ("Victim-1"), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Under § 841(b)(1)(A), if the Government proves that Victim-1's death resulted from Sarnelli's distribution of methamphetamine, he faces a mandatory minimum sentence of twenty years' imprisonment (the "Enhanced Penalty"). Count Two of the Indictment ("Count Two") charges Sarnelli with distributing and possessing with intent to distribute 50 grams and more of mixtures and substances containing a detectable

amount of methamphetamine, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B).

Before the Court is Sarnelli's motion to dismiss Count One and to suppress evidence seized during his May 15, 2021 arrest as well as statements he made to law enforcement. ECF No. 29 (the "Motion"). First, Sarnelli argues that Count One fails to state an offense, because it does not charge that Victim-1's death was the object of the narcotics conspiracy. Second, Sarnelli contends that Count One must be dismissed, because the death that is the predicate of the Enhanced Penalty in Count One occurred in the Eastern District of New York. Third, Sarnelli asserts that evidence seized during his arrest and statements he made to law enforcement must be suppressed, because his Fourth Amendment rights were violated when his property was searched and seized without a warrant or valid consent, and his Fifth Amendment rights were violated when he was improperly questioned before receiving his Miranda warnings. For the reasons that follow, we deny the Motion in its entirety.

## I.   **BACKGROUND**

The facts relevant to Sarnelli's motion to dismiss are distinct from those applicable to his motion to suppress. The Court therefore addresses each in turn.

A. **The Motion to Dismiss**[1]

On the evening of August 7, 2019, Sarnelli made plans to see Victim-1, an individual with whom Sarnelli was in an intimate relationship.  Gov't Opp. at 3; Def. Br. at 1.  The following morning, Sarnelli called 9-1-1 to report that Victim-1 was choking and had possibly overdosed.  Def. Br. at 1.  Police officers responded to the address Sarnelli provided, performed CPR on Victim-1, and transported her to the Long Island Medical Center, where she was pronounced dead.  Id.  Sarnelli had left the scene before the officers arrived.  Gov't Opp. at 4. Medical examiner reports confirmed that Victim-1 died from a methamphetamine overdose; no other contributing factors were listed as the cause of death.  Id.

B. **The Motion to Suppress**

On November 17, 2022, the Court held an evidentiary hearing on Sarnelli's motion to suppress (the "Suppression Hearing"). Two of the three officers who arrested Sarnelli on May 15, 2021 -- Detective James Johnson ("Detective Johnson" or "Johnson") and Special Agent Matthew Dean ("Agent Dean" or "Dean," and together "the agents") -- testified on behalf of the Government,

---

[1] With respect to Sarnelli's motion to dismiss, the Court relies on the following facts as outlined in the parties' briefs.  In this Memorandum and Order, citations to "Def. Br. _____" refers to Sarnelli's memorandum in support of the Motion, dated July 8, 2022; "Gov't Opp. _____" refers to the Government's opposition to the Motion, dated August 15, 2022; "Def. Reply _____" refers to Sarnelli's reply in support of the Motion, dated September 6, 2022; and "Gov't Sur-reply _____" refers to the Government's sur-reply in opposition, dated September 27, 2022.

along with Mr. Reginald Donaldson ("Donaldson"), a forensic consultant. The third arresting officer, Michael Coyne ("Officer Coyne" or "Coyne") testified on behalf of the defense. The Government and Sarnelli submitted declarations and affidavits prior the Suppression Hearing and filed written submissions following the Suppression Hearing. Accordingly, the Court derives the following facts from testimony at the Suppression Hearing, the exhibits introduced at the Suppression Hearing, and the declarations and affidavits submitted by the Government and defense.[2]

### 1. Investigation into Sarnelli

The Government began an investigation of Sarnelli in late 2019. As a result of that investigation, it learned the following non-exhaustive facts:

<u>First</u>, local Suffolk County records showed that Sarnelli was arrested in May 2019 while in possession of methamphetamine. GXs 117, 117A. Following that arrest, Sarnelli signed a waiver of his <u>Miranda</u> rights, and according to officer notes, confessed

---

[2] In this Memorandum and Order, citations to "Tr. _____" refer to the transcript of the Suppression Hearing; citations to "GX_____" refer to exhibits introduced by the Government at the Suppression Hearing and received by the Court into evidence; citations to "Def. Decl. ¶ _____" refer to Sarnelli's Declaration, dated July 8, 2022; citations to "Caulfield Decl. ¶ _____" refer to the declaration of Kara Caulfield ("Caulfield") submitted on behalf of the defense, filed September 6, 2022; citations to "Johnson Aff. ¶ _____" refer to the affidavit of Detective Johnson, filed August 15, 2022; citations to "Dean Aff. ¶ _____" refer to the affidavit of Agent Dean, filed August 15, 2022; citations to "Def. Post-Hearing Br. _____" refer to Sarnelli's post-hearing brief, filed December 5, 2022; and citations to "Gov't Post-Hearing Br. _____" refer to the Government's post-hearing brief, filed December 19, 2022.

that he "bought a half pound of meth in the city for $2,200" and he had been trafficking methamphetamine for approximately four months.  Id.

Second, a number of confidential witnesses and informants told Detective Johnson and Agent Dean that Sarnelli drove into Manhattan to obtain methamphetamine for resale on Long Island, and that his girlfriend, Kara Caulfield, was complicit and would accompany him on those trips into Manhattan.  For instance, a source code-named Bravo[3] informed the agents that (i) Sarnelli traveled into Manhattan to "obtain large quantities of methamphetamine[] to then resell on Long Island," Tr. at 9, 180; (ii) he had previously driven Sarnelli to meet up with Sarnelli's supplier in a hotel room near Times Square, where he observed a "mountain of meth," GX 101 at 3; and (iii) he drove Sarnelli into midtown Manhattan in October 2020 to pick up methamphetamine and saw the methamphetamine that Sarnelli purchased on that trip, which was stored in Ziploc bags.  Tr. at 181–183.  The agents used License Plate Reader ("LPR") hits to corroborate Bravo's account of the October 2020 trip, which confirmed that his registered vehicle traveled into Manhattan via the Queens-Midtown Tunnel at 1:37 A.M. on October 16, 2020

---

[3] The Government requested permission to use pseudonyms in its exhibits and during testimony at the Suppression Hearing to protect the identities and safety of cooperating witnesses and confidential sources whose names are not currently in the public record.  Tr. at 2-3.  The Court granted the Government's request, id. at 3, and thus any references in this Memorandum and Order to those individuals are made using the same pseudonyms.

and drove back towards Long Island via the Queens-Midtown Tunnel at 2:09 A.M.  See GX 901.[4]

A man code-named Sagan also verified that Sarnelli procured methamphetamines in Manhattan for redistribution on Long Island. Id. at 31.  In March 2021, Sagan told the agents that he had recently visited Sarnelli at 38 The Helm ("The Helm"), a residence where Sarnelli was staying.  GX 120.  Sagan observed a large quantity of methamphetamine during his visit, and Sarnelli told Sagan that he was "picking up crystal methamphetamine from about four or five different people in New York City."  Id.  In addition, Sagan informed Detective Johnson and Agent Dean that Caulfield often drove Sarnelli to pick up methamphetamine, and she had driven Sarnelli into Manhattan to resupply as recently as January 25, 2021, after which they brought the methamphetamine back to Suffolk County.  See GX 119.  Caulfield also gave Sagan one of Sarnelli's phone numbers so Sagan could directly purchase methamphetamine from Sarnelli.  Tr. at 44, 46.[5]

---

[4] Although agents believed Bravo's information to be credible, see Tr. at 17, 199-200, the Government stopped using him as a source on October 19, 2020 after learning that Bravo was being investigated for strangling his significant other, threatening to chop her head off, and stabbing a law enforcement officer.  Id. at 137-38.  Before working with law enforcement, Bravo had also been convicted of numerous crimes, including murder.  Id. at 138.

[5] Like Bravo, the Government decided to terminate its relationship with Sagan, because Sagan sold drugs in violation of the conditions of his pretrial release and continued to do so after the Government warned him to stop.  Id. at 48-49.

Two other sources, Cooperating Witness-1 ("CW-1") and
Cooperating Witness-2 ("CW-2"), began proffering with the
Government in January 2021.  Id. at 33-34.  CW-1 informed law
enforcement that: Sarnelli was a major methamphetamine dealer
who procured his drugs from Manhattan; he and Sarnelli
occasionally bought methamphetamine from the same source in
Manhattan; and he and Sarnelli traveled into Manhattan so
Sarnelli could ask their mutual source to supply Sarnelli
individually, though that proposed transaction was unsuccessful.
Id. at 35-37, 191-93.  CW-2 told authorities that she picked up
methamphetamine in Manhattan with Sarnelli multiple times and
distinctly recalled one instance in which Sarnelli procured
methamphetamine from a hotel in midtown Manhattan and concealed
the drugs in a potato chip bag as they traveled back to Suffolk
County.  Id. at 37-39.  CW-2 also had knowledge of a trip that
CW-1 took with Sarnelli into Manhattan and recalled helping
Sarnelli sell drugs "hundreds" of times.  Id. at 39.

Third, Detective Johnson and Agent Dean used control buys
to help verify the information they received from their
informants and witnesses.  In January 2021, a confidential
informant conducted a controlled purchase of methamphetamines
from Sarnelli in Suffolk County and was accompanied by an
undercover detective.  Id. at 32-33; see GX 118.  In addition,
Sarnelli provided Sagan with a sample of methamphetamine in

March 2021 at Sarnelli's home address, and Sagan later conducted two controlled purchases of methamphetamine from Sarnelli on March 18, 2021 and April 27, 2021. GXs 120, 122-23. On March 29, 2021, Sagan set up a drug deal with Sarnelli, who arrived with Caulfield in her vehicle (the "SUV"), smoked methamphetamine in front of Sagan, and discussed selling methamphetamine to Sagan, which was captured over a recording device. GX 310 at 8-9. Caulfield provided Sagan the current market prices for methamphetamine that day. Id. And three days before Sarnelli's arrest, Sagan attempted to conduct another controlled buy from Sarnelli. GX 223. Sarnelli called off the buy because Sagan brought another person with him. Id. However, agents surveilling the area observed Caulfield, in the SUV, speaking with Sarnelli at the scene. Id.

Fourth, the Government obtained multiple judicially authorized search warrants, which enabled law enforcement to further confirm Sarnelli's pattern of obtaining drugs from Manhattan and Caulfield's complicity in those purchases. Notably, multiple Southern District of New York Magistrate Judges granted warrants for prospective cell phone location "pings" and pen register information warrants for two cell phones belonging to Sarnelli. GXs 301-05, 307-08. While those warrants were active -- including through the date of Sarnelli's arrest -- Johnson and Dean received data through email and text

message with Sarnelli's location information.   Tr. at 54, 214.
The agents observed that Sarnelli's phone regularly pinged in
midtown Manhattan, after which he would return to Long Island.
Tr. 57, 196-197, 207-208; GXs 803-805.   In one instance, while
Sarnelli's phone was pinging in midtown, Caulfield posted a
photograph on Facebook with a location tag of "Lexington Avenue,
Manhattan" and showing the top of a clear Ziploc bag, which was
consistent with the agents' understanding from witness
interviews that Sarnelli would "store methamphetamine and pick
up methamphetamine in Ziploc bags."   See GX 218; Tr. at 196-197;
see also GX 121 at 1.   Also, just two weeks before Sarnelli's
arrest, the agents saw Sarnelli's phone pinging in midtown
Manhattan, Tr. 57, 207-208; GXs 803-805, after which video
surveillance showed Sarnelli returning to The Helm in an Uber
with his phone and a military-style backpack, which was
consistent with prior information witnesses provided the agents
that Sarnelli kept drugs in that sort of backpack.   See GXs 206,
206A; Tr. at 59-60.   Sagan also confirmed to the agents that
Sarnelli had resupplied with methamphetamine in Manhattan that
day.   Tr. at 208.   In addition to the cell phone warrants, the
agents obtained a judicially authorized tracker warrant for the
SUV on March 31, 2021, based on facts establishing probable
cause to believe that Sarnelli was using the SUV in furtherance

of narcotics trafficking offenses.  GX 310 at 9-10.[6]  However,
two Eastern District of New York Magistrate Judges denied
warrant requests to search Sarnelli's residence at The Helm;
both applications were rejected within two weeks of Sarnelli's
arrest.  Gov't Sur-Reply at 4 n.2.

Based on this information, Agent Dean prepared a plan to
arrest Sarnelli in late April 2021, which was memorialized in an
operations order (the "Operations Order") and approved by FBI
supervisors.  Tr. 173-78; GX 217.  The Operations Order called
for monitoring Sarnelli's location during the following 30 days
and stopping and arresting him if he was observed returning to
Long Island from Manhattan.  See GX 217.

### 2. The May 15, 2021 Arrest and Subsequent Complaint

On May 15, 2021, one of Sarnelli's phones was pinging in
midtown Manhattan, starting around 2:00 A.M.  See GXs 207, 807.
LPR information showed that the SUV was also in midtown
Manhattan around that time.  See GX 207; see also GXs 806-808.
Detective Johnson and Agent Dean believed that Sarnelli would
likely travel back to Long Island in the SUV with controlled
substances and planned to stop the SUV as it returned from
Manhattan to Suffolk County.  Tr. at 63.

---

[6] That tracking warrant expired shortly before the date of Sarnelli's arrest.
GX 310; Tr. at 62.

In the late afternoon, Sarnelli's phone began pinging eastbound towards Long Island, and the agents decided to intercept Sarnelli on the Long Island Expressway.  Id. at 64-65. Detective Johnson drove solo in an unmarked vehicle, and Dean drove separately in a marked Suffolk County Police Department ("SCPD") car with Officer Coyne.  Id. at 65-66.  Detective Johnson stopped in a cut in the middle of the highway, faced eastbound, and saw the SUV approach him.  He observed a female driver who appeared to be Caulfield and a male who appeared to be Sarnelli sitting in the front passenger seat.  Id. at 65, 69. He also saw a blue surgical mask hanging from the rearview mirror.  Id. at 69.

After the vehicle passed Detective Johnson, Officer Coyne and Agent Dean activated their lights and sirens and stopped the SUV; Detective Johnson then pulled in front of the SUV to prevent any escape.  Id. at 70-71.  Both Detective Johnson and Agent Dean drew their firearms, approached the vehicle, and loudly ordered Sarnelli and Caulfield to turn off the vehicle and show their hands.  Id. at 72-74.  The agents then removed Sarnelli and Caulfield from the SUV and immediately handcuffed and separated them.  Id. at 74-77.  Sarnelli was led to the rear

of Detective Johnson's vehicle and Caulfield was placed in Officer Coyne's vehicle. Id. at 76-77.[7]

Next, Detective Johnson and Agent Dean performed a plain view sweep of the SUV, opening side doors and looking into the windows to ensure that no one was concealed in the vehicle and that no weapons were readily visible. Id. at 77-78, 88. Detective Johnson recalled seeing multiple cell phones in the front and a military-style backpack in the rear. Id. at 78.

Following the sweep, Detective Johnson walked towards Sarnelli and began questioning him without providing Miranda warnings. Id. at 79. Johnson told Sarnelli "something to the effect [of], Tony, you know what this is about, and he indicated that he did," and then asked if there was anything in the vehicle that was going to hurt the officers. Id. at 79. Sarnelli replied, in sum and substance, that "he's not a violent person; what [the agents] were looking for was in the backpack; and that Kara [Caulfield] wasn't involved." Id. Johnson asked if Sarnelli would consent to a search of his backpack, and Sarnelli said that he would. Id. at 80-81. Johnson then obtained a written SCPD permission-to-search form and asked Sarnelli to read a line from the form as proof that he could read and understand English. Id. at 81-82; GX 124. Sarnelli

---

[7] The Government now acknowledges that Sarnelli was arrested when the agents removed him from the SUV and handcuffed him. Id. at 112-13, 144.

read a portion aloud, Detective Johnson filled out the form, and Sarnelli signed and dated it at 5:59 P.M.  Tr. at 82-85.  The agents then presented a separate permission-to-search form to Caulfield authorizing the officers to search the SUV, which she signed at 6:02 P.M.  Id. at 86-87, 225; GX 124.

Upon opening the backpack, the agents found multiple controlled substances, including various pills, liquid vials, drug paraphernalia, and a large rock of a white substance that field tested positive for methamphetamine.  Id. at 90-93; GXs 502-07.  Sarnelli was subsequently transported for arrest processing.  Tr. at 94.

Two days later, the Government filed a complaint against Sarnelli, ECF No. 1 (the "Complaint"), which differed notably from the agents' sworn testimony at the Suppression Hearing and affidavits signed by the agents filed in support of the Government's submissions on the Motion.  Contrary to the facts described above, paragraph 5(f) of the Complaint implies that the agents only stopped the SUV because they observed a traffic violation and states that they arrested Sarnelli after obtaining verbal and written consent to search his backpack and finding methamphetamine inside it.  Id.

## II.   DISCUSSION

### A. The Motion to Dismiss

#### 1. Adequacy of Allegations in the Indictment

Sarnelli contends that the allegations in Count One do not support the Enhanced Penalty, and the Court should therefore dismiss Count One of the Indictment.[8]   Def. Br. at 1.   We disagree.

Count One reads as follows:

1. From at least in or about 2019, up to and including in or about May 2021, in the Southern District of New York and elsewhere, CARMINE SARNELLI, aka "Tony," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that CARMINE SARNELLI, a/k/a "Tony," the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841 (a)(1).

3. The controlled substance that CARMINE SARNELLI, a/k/a "Tony," the defendant, conspired to distribute and possess with intent to distribute was 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 841 (b)(1)(A).

4. The use of such controlled substance, which had been distributed by CARMINE SARNELLI, a/k/a

---

[8] It is unclear from Sarnelli's briefing whether he asks the Court to only dismiss the Enhanced Penalty or to dismiss Count One in its entirety.   Either way, we would deny Sarnelli's motion.

> "Tony," the defendant, on or about August 8,
> 2019, resulted in the death of Luis Geraldo
> Nunez, a/k/a "Tiffany."

ECF No. 15.

A comparison between Count One and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 shows that Count One mirrors, almost verbatim, the text of the statutes Sarnelli is alleged to have violated.   The Second Circuit has "consistently upheld indictments" that "'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"  United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (quoting United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir.), cert. denied, 423 U.S. 832 (1975)); accord United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (internal citation and quotation marks omitted).   Indeed, Federal Rule of Criminal Procedure 7(c) merely requires that an Indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."

As the allegations in Count One reiterate the language of 21 U.S.C. §§ 841 and 846, the Indictment is adequate.   See Walsh, 194 F.3d at 45 (tracking the statutory text in an indictment is "sufficient to provide the defendant with adequate notice of the charges, allow him to prepare his defense, and

ensure that he was not prosecuted based on evidence not presented to the grand jury").

Nonetheless, Sarnelli contends, based on the text of 21 U.S.C. §§ 841 and 846 and the reasoning of a Second Circuit case, United States v. Wexler, 522 F.3d 194 (2d Cir. 2008), that the failure of Count One to allege that the death of Victim-1 was an object of the charged narcotics conspiracy requires its dismissal. See Def. Br. at 4-8; Def. Reply at 17. Sarnelli's argument is without support in text or case law.

First, Sarnelli's plain text argument fails as a matter of statutory construction. The object of a defendant's conspiracy under §§ 841 and 846 is to "knowingly and intentionally . . . manufacture, distribute, or dispense" or "possess with intent to manufacture, distribute, or dispense" a controlled substance. Section 841(b)(1)(A) is a separate penalty provision that triggers certain mandatory minimum sentences based on the type and weight of the controlled substance at issue and whether a substance distributed as part of the conspiracy was the "but for" cause of a victim's death. See United States v. Beqiraj, 17-cr-315 (RMB) (S.D.N.Y. July 11, 2018), ECF No. 45, at 85 (jury instruction that the objects of the charged narcotics conspiracy in a death-resulting case were "(1) the distribution of a controlled substance and (2) possession with the intent to distribute a controlled substance"); see also Burrage v. United

States, 571 U.S. 204, 210-11 (2014) (Government must prove beyond a reasonable doubt that a knowing and intentional distribution of a drug is a "but for" cause of death to satisfy 21 U.S.C. § 841(b)(1)).

Second, Sarnelli's reading of United States v. Wexler, 522 F.3d 194 (2d Cir. 2008) is not supported by the opinion itself. There, Count One of defendant Wexler's seventeen-count indictment alleged that:

> It was a part and an object of said conspiracy that DAVID E. WEXLER, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, to wit, Hydromorphone, commonly known as "Dilaudid," a Schedule II controlled substance, in violation of Sections 812, 841(a)(1) and 841(b)(1)(C) of Title 21, United States Code, which resulted in death.

Id. at 206.  Wexler was convicted of all seventeen counts and appealed, arguing, inter alia, that the Government did not prove -- as specifically alleged in Count One -- that Wexler participated in a conspiracy to redistribute the particular drug, Dilaudid, that caused the overdose victim's death.  Id. at 206-09.  The Second Circuit agreed, reasoning that the district court should not have upheld the jury's conviction on Count One when the Government merely presented evidence at trial that Wexler participated in conspiracy to redistribute "a variety of drugs" and failed to establish the object of the conspiracy alleged, namely, the distribution of Dilaudid.  Id. at 209.

Contrary to Sarnelli's extrapolation, the Government had a proof problem in Wexler, not a pleading problem. That case merely stands for the uncontroversial proposition that "[w]here . . . the type of drug is a critical determinant of the length of a defendant's sentence, the Government should be required to prove what it alleges" in its indictment. Id. Nowhere in Wexler does the Second Circuit hold that an indictment must allege that the object of a narcotics conspiracy resulting in a victim's death is an agreement among co-conspirators to distribute a specific drug to a specific person. In fact, the Second Circuit clearly states that the "object crime" of the conspiracy in Wexler was merely "the distribution of Dilaudid," id. at 207, just as the object crime alleged in Sarnelli's Indictment is the distribution of methamphetamine and possession with intent to distribute methamphetamine. See ECF No. 15 ¶¶ 2-3. A decision to the contrary would, as the Government notes, be "inconsistent with well-established law that an overdose death need not be reasonably foreseeable to a defendant in order to trigger death-resulting liability." Gov't Sur-reply, at 10; see United States v. Sica, 676 F. App'x 81, 84 (2d Cir. 2017) (the "foreseeability argument has been rejected by every court of appeals to have considered the question") (collecting cases). Likewise, Sarnelli's position suggests an unlikely statutory regime, under which Congress intended for the death-resulting

penalties in 21 U.S.C. § 841 to apply only to the street-level dealer who distributes a deadly dose to a victim, but not to the "suppliers, leaders, and managers directly involved in that distribution chain." Gov't Opp. at 12-13 n.1.

Undeterred by the flaws in his creative argument, Sarnelli contends that the Government "faithfully adhered" to his preferred reading of Wexler by not charging overdose death penalties in a few high-profile narcotics conspiracy cases. Def. Br. at 6-8. This argument is entirely speculative, and we decline to enter Sarnelli's speculative realm.

### 2. Venue

Sarnelli also contends that Count One of the Indictment should be dismissed for lack of venue in the Southern District of New York, because Victim-1 used methamphetamine and died in Suffolk County, which is within the Eastern District of New York. Def Br. at 8-9. Once again, Sarnelli's argument is without foundation.

As an initial matter, although the Government must prove venue with respect to each count by a preponderance of the evidence at trial, the Government meets its burden on a pretrial motion to dismiss when an indictment simply alleges facts sufficient to support venue. See, e.g., United States v. Peterson, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005); United States v. Stein, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006).

Count One of the Indictment alleges that Sarnelli participated in a narcotics conspiracy "in the Southern District and elsewhere." ECF No. 15 ¶ 1. As "innumerable courts in this District have held," that general allegation is sufficient to support venue at this stage. United States v. Dupigny, No. 18-cr-528 (JMF), 2019 WL 2327697, at *4 (S.D.N.Y. May 30, 2019) (collecting cases).

Moreover, Sarnelli's reliance on 18 U.S.C. § 3236 -- the federal homicide statute -- to restrict venue to the Eastern District of New York is contrary to case law. It is well-established that § 3236 only applies to unitary acts of murder and manslaughter, not deaths linked to a conspiracy. See, e.g., United States v. Gotti, 660 F. Supp. 2d 512, 515 (S.D.N.Y. 2009). Section 3237 applies here because conspiracy is a "continuing offense," and thus "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators." United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003) (internal quotation marks omitted); United States v. Kloszewski, 760 F. App'x 12, 15-16 (2d Cir. 2019); United States v. Tzolov, 642 F.3d 314, 319-20 (2d Cir. 2011). Consistent with this authority, this Court has previously held that venue was proper for a murder charged under 21 U.S.C. § 848(e) that occurred in Michigan, because overt acts in furtherance of the charged narcotics

conspiracy occurred in the Southern District of New York. Perez
v. United States, No. 04-cr-937 (NRB), 2015 WL 3413596, at *4
(S.D.N.Y. May 27, 2015). Likewise, in United States v. Shaw,
No. 06-cr-41 (CM), 2007 WL 4208365 (S.D.N.Y. Nov. 20, 2007),
venue was proper in the Southern District of New York for a
murder that occurred in the Eastern District of New York,
because the murder was charged as part of a conspiracy, and the
defendants committed acts in furtherance of the conspiracy in
the Southern District. Id. at *1-4. Sarnelli has cited no case
law to the contrary.

Again speculating that the Government is dangerously
expanding its reach in narcotics conspiracy cases, Sarnelli also
alleges that the Government is "eliminating the rational
connection between an overdose death on the one hand . . . and
an appropriate venue for prosecution on the other" by bringing
this case in the Southern District of New York, which he claims
will "lead to absurd and unjust results." See Def. Br. at 9-13.
This argument is puzzling, because even a cursory analysis of
the relevant statutory scheme shows that venue is not a unitary
concept, particularly with respect to conspiracy charges. See,
e.g., Tzolov, 642 F.3d at 320 (unlike venue for a securities
fraud charge, venue for a conspiracy charge merely required an
act sufficient to establish venue, which "need not be unlawful;

it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy").

Accordingly, for the reasons set forth above, Sarnelli's motion to dismiss for improper venue is denied.

## B. **Motion to Suppress**

### 1. Fourth Amendment

There are two prongs to Sarnelli's Fourth Amendment claim. Sarnelli contends that: (i) the agents did not have probable cause to stop and search Caulfield's SUV; and (ii) Sarnelli did not provide voluntary consent to search the backpack. We reject both arguments.

#### i. *Probable Cause*

The Government undoubtedly had more than sufficient probable cause to believe that Sarnelli was a drug dealer. However, as the Government concedes, that is not the relevant question. Gov't Post-Hearing Br. at 2. The Court must instead determine whether the agents had probable cause to believe that Sarnelli was traveling back from Manhattan in the SUV with evidence of narcotics trafficking on May 15, 2021. Id. We conclude that they did.

Under the automobile exception, a "warrantless search of a movable vehicle is permissible when the police have probable cause to believe that the vehicle contains contraband." United States v. Harwood, 998 F.2d 91, 96 (2d Cir. 1993)

(citing <u>Carroll v. United States</u>, 267 U.S. 132, 156 (1925), <u>California v. Acevedo</u>, 500 U.S. 565, 571 (1991), <u>United States v. Ross</u>, 456 U.S. 798, 808-09 (1982), and <u>Chambers v. Maroney</u>, 399 U.S. 42, 51-52 (1970)).   The Supreme Court has explained that "pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches [of vehicles] without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met."  <u>California v. Carney</u>, 471 U.S. 386, 392 (1985).

Warrantless searches authorized by the automobile exception are "no broader and no narrower than a magistrate could legitimately authorize by warrant," <u>Ross</u>, 456 U.S. at 825, and must be confined to the areas within a vehicle where the searching officer has probable cause to believe contraband will be found.  <u>Acevedo</u>, 500 U.S. at 580.   Nonetheless, probable cause "justifies the search of every part of the vehicle and its contents that may conceal the object of the search."   <u>United States v. Babilonia</u>, 854 F.3d 163, 178 (2d Cir. 2017) (internal quotation marks omitted).   Thus, if police have probable cause to search an entire vehicle, they may search all compartments, containers, and packages within the vehicle, including those belonging to passengers.  <u>Wyoming v. Houghton</u>, 526 U.S. 295, 302 (1999).   The Government bears the burden of establishing

probable cause.  United States v. Delossantos, 536 F.3d 155, 158 (2d Cir. 2008).

The Government has met its burden here.  Over nearly two years, the Government gathered extensive, credible evidence that Sarnelli regularly purchased methamphetamine in Manhattan for resale in Suffolk County.  A bevy of witnesses independently provided the agents with detailed accounts of this pattern, which were corroborated through, inter alia, controlled buys, LPRs, location pings gathered from judicially authorized warrants, physical and video surveillance, and Sarnelli's own admissions to local Suffolk County officers.

The agents also established that Caulfield was likely complicit in Sarnelli's drug dealing, accompanying him into Manhattan to pick up methamphetamine, and using the SUV to transport methamphetamine.  Among other pieces of evidence, Caulfield gave Sagan one of Sarnelli's phone numbers so Sagan could directly purchase methamphetamine from Sarnelli.  Tr. at 44, 46.  At another point, Caulfield accompanied Sarnelli to a potential drug deal with Sagan in the SUV, during which Sarnelli smoked methamphetamine in front of Sagan and discussed selling methamphetamine to Sagan, all of which was captured over a recording device.  GX 310.  Caulfield also provided the current market prices for methamphetamine that day.  Id.  Around the time that Sarnelli's phone was pinging in midtown Manhattan on

March 20, 2021, Caulfield posted a photograph on Facebook with a location tag of "Lexington Avenue, Manhattan" and showing the top of a clear Ziploc bag, which was consistent with the agents' understanding that Sarnelli would "store methamphetamine and pick up methamphetamine in Ziploc bags."  See GX 218; Tr. at 196-197; see also GX 121 at 1.  Three days before Sarnelli was arrested, agents surveilled an attempted (albeit ultimately failed) methamphetamine transaction and observed Caulfield in the driver seat of the SUV, speaking with Sarnelli.  See GX 223.  And of course, the Government was able to obtain a judicially authorized tracker warrant for the SUV based on facts establishing probable cause to believe that Sarnelli was using the SUV in furtherance of narcotics trafficking offenses.  See GX 310.

Thus, on May 15, 2021, when officers saw that Sarnelli's phone was pinging in midtown Manhattan starting at around 2:00 A.M., see GXs 207, 807, and LPR information showed the SUV also in midtown Manhattan around that time, see GX 207, the agents had probable cause to believe that Sarnelli was in Manhattan with Caulfield to pick up methamphetamine for resale on Long Island.  Thus, the agents had probable cause to search the SUV for evidence of narcotics trafficking, including Sarnelli's backpack.  Houghton, 526 U.S. at 302.

Sarnelli argues that the information the Government gathered from its informants was unreliable and stale, and thus the Government could not credibly believe that the SUV contained evidence of narcotics trafficking.  See Def. Post-Hearing Br. at 5.  In terms of reliability, there is no doubt that some of the witnesses who relayed information to the Government were imperfect.  Notably, although the agents found Bravo and Sagan -- two key witnesses -- to be credible, both were terminated by the Government: Bravo was accused of assaulting a woman and threatening a police officer on October 8, 2020, Tr. at 137-38, and Sagan sold drugs while attempting to cooperate with the Government after the Government warned him to stop.  Tr. 48-49. However, the Government's evidence against Sarnelli was not wholly dependent on reports from either Bravo or Sagan, nor any other individual witness with whom Sarnelli takes issue. Rather, as noted above, the agents received consistent information from all of its witnesses and carefully verified witness statements through a multiplicity of methods.[9]

Nor was information the Government received stale.  "[T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the

---

[9]  However, the Government's reliance on the fact that, in post-arrest statements, Caulfield confirmed "everything that witnesses had told the agents throughout the investigation" is completely misplaced.  Gov't Post-Hearing Br. at 6.  As Government counsel is no doubt well-aware, probable cause determinations are not made in retrospect.

nature of the conduct alleged to have violated the law." <u>United States v. Diaz</u>, 176 F.3d 52, 109 (2d Cir. 1999) (quoting <u>United States v. Gallo</u>, 863 F.2d 185, 192 (2d Cir. 1988)) (internal quotation marks omitted).  As the Government correctly notes, "narcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness." <u>United States v. Rowell</u>, 903 F.2d 899, 903 (2d Cir. 1990) (18-month delay between receiving information and applying for a wiretap warrant did not make the information stale); <u>United States v. Singh</u>, 390 F.3d 168, 181–82 (2d Cir. 2004) (lapse of more than 20 months between the last occurrence of facts relied on and the issuance of a warrant was not stale, because the information provided by the informant indicated fraudulent activity of an ongoing and long-term nature).  Here, the Government obtained consistent information spanning two years that Sarnelli re-supplied in Manhattan, which was corroborated through location monitoring and video and physical surveillance during the two months prior to his arrest, GXs 206, 206A, 301-05, 803-05, and was found sufficient by a Magistrate Judge in the Southern District of New York to grant a cellphone location data warrant three days before Sarnelli's arrest.  GX 308.

Sarnelli also contends that the agents could not have had probable cause on May 15, 2021, because two Magistrate Judges

denied warrant applications to search The Helm for narcotics less than two weeks before Sarnelli's arrest. Tr. at 51-52. These denials do not vitiate a finding of probable cause with respect to the SUV. "[W]hen it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 569 U.S. 1, 6 (2013). The Supreme Court has stated that the at the Fourth Amendment's "very core" "stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018) (internal quotation marks omitted). "Freedom" in one's own "dwelling is the archetype of the privacy protection secured by the Fourth Amendment"; conversely, "physical entry of the home is the chief evil against which [it] is directed." Payton v. New York, 445 U.S. 573, 585 (1980) (internal quotation marks omitted); accord Lange v. California, 141 S. Ct. 2011, 2018 (2021). By contrast, citizens have a lesser expectation of privacy in automobiles. See Carney, 471 U.S. at 391 (noting the "lesser expectation of privacy resulting from [an automobile's] use as a readily mobile vehicle"); Collins, 138 S. Ct. at 1672 (noting that "the rationales underlying the automobile exception are specific to the nature of a vehicle and the ways in which it is distinct from a house").

Finally, Sarnelli argues that the Government concocted multiple, shifting stories after May 15, 2021 to justify the

agents' stop and arrest.  As previously noted, paragraph 5(f) of the Complaint, written two days after Sarnelli's arrest, implies that agents stopped the SUV because they observed a traffic violation and incorrectly states that they only arrested Sarnelli after searching his backpack with his consent.  ECF No. 1.  While the Court is appreciative of the intensive and exhaustive submissions by defense counsel, no inconsistency they have identified in the Government's submissions approaches the level which would require the Court to cast aside the ample probable cause for the arrest and search.  That being said, the Court remains mystified as to why the Government ever relied, in a court filing, on a traffic violation stemming from a hanging COVID mask as the purported basis for stopping the SUV -- a justification so off-point that Detective Johnson quite literally laughed it off on the witness stand during the Suppression Hearing.  Tr. at 95.

### ii. *Voluntariness of Consent*

Although there are, to be sure, indicia of coercion by the agents, the Court finds that Sarnelli's consent to search his backpack was voluntarily and freely given, providing the agents a separate and lawful basis to search the backpack.

"[A] search authorized by consent is wholly valid" under the Fourth Amendment.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973).  "[W]hen a prosecutor seeks to rely upon consent to

justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Id. (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).  Whether consent to a search "was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."  Id. at 227 (internal quotation marks omitted). "Consent can be found from an individual's words, acts[,] or conduct." Krause v. Penny, 837 F.2d 595, 597 (2d Cir. 1988); accord United States v. Frye, 826 F. App'x 19, 21 (2d Cir. 2020), cert. denied, 141 S. Ct. 2816 (2021).  The Government "bears the burden of proving by a preponderance of the evidence that the consent was voluntary." United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006).

Although "more than a mere acquiescence in a show of authority is necessary to establish that consent was voluntarily given, the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness." United States v. Pena Ontiveros, 547 F. Supp. 2d 323, 331 (S.D.N.Y. 2008), aff'd sub nom. United States v. Rico Beltran, 409 F. App'x 441 (2d Cir. 2011) (internal citation and quotation marks omitted).  And "[t]he fact that police drew their guns to effectuate the arrest does not necessarily establish coercion, [and] neither does the fact

that [the defendant] was handcuffed." United States v. Ansaldi, 372 F.3d 118, 129 (2d Cir. 2004).

Here, the agents holstered their weapons before removing Sarnelli and Caulfield from the SUV, and although the Government concedes that the agents obtained Sarnelli's written and oral consent through un-Mirandized questioning, it is well-established that "failure to give a Miranda warning does not require suppression of physical evidence discovered as a consequence of unwarned statements." United States v. McCoy, 407 F. App'x 514, 516 (2d Cir. 2010) (citing United States v. Patane, 542 U.S. 630 (2004)). The Court also finds it relevant here that this was not the defendant's first arrest: Sarnelli waived his Miranda rights after his 2019 arrest and thereafter informed officers that he "bought a half pound of meth in the city for $2,200" and noted that he had been trafficking methamphetamine for approximately four months. GXs 117, 117A. Sarnelli was thus not ignorant with respect to his right to remain silent and could have reasonably been expected to invoke it if he felt that the agents' requests for his consent were unduly coercive.

Indeed, Sarnelli had multiple opportunities to refuse consent and did not take them. Sarnelli was first asked whether anything in the SUV could hurt the officers, and he replied that everything the agents were looking for was in the backpack, and

that Caulfield was not involved.  Tr. at 79.  Then, Sarnelli verbally consented to a search of his backpack, read aloud from his permission-to-search form, and provided written consent to search the backpack.  Tr. at 80-87; GX 124.[10]  The Court also finds the officers' testimonies that Sarnelli was calm and cooperative to be credible, though we are not willing to say, as the Government implies, that Sarnelli's affidavit must be completely rejected because he did not face cross-examination at the Suppression Hearing.  Gov't Post-Hearing Br. at 8.  The Court respects Sarnelli's strategic decision to not testify.  We do, however, recognize the case law in this district noting that Courts may afford greater weight to witness testimony over a defendant's sworn statement when the defendant does not face cross-examination.  See, e.g., United States v. Yong Wang, No. 11-cr-730 (PGG), 2013 WL 452215, at *7 (S.D.N.Y. Feb. 5, 2013) (collecting cases).

Thus, under the totality of the circumstances, the Court finds Sarnelli's consent to be voluntarily given.

### 2. Fifth Amendment

Apparently recognizing that the arresting officers violated Sarnelli's Miranda rights, the Government states that it will not offer any of Sarnelli's pre-Mirandized statements in

---

[10] Testimony at the suppression hearing did not elaborate on Sarnelli's age, education, and intelligence, but there is no argument that those factors invalidated his consent.

its case in chief. See Gov't Opp. at 13, 17, 25.[11] Consequently, the Government argues that Sarnelli's motion to suppress these statements is moot. Id. The Court concurs.

### III. CONCLUSION

For the foregoing reasons, Sarnelli's motion to dismiss and motion to suppress are denied. A subsequent conference is hereby scheduled for February 16, 2023 at 12:00 P.M. Speedy trial time is excluded until then. 18 U.S.C. § 3161(h)(7)(A).

**SO ORDERED.**

Dated:     New York, New York
           January 17, 2023

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[11] The Government nonetheless limply insists, ipse dixit, that Sarnelli was not improperly questioned before receiving his Miranda warnings. Id. at 25.