

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 31, 2023

**BY ECF**

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

>   Re:   *United States v. Carmine Sarnelli*, **22 Cr. 116 (NRB)**

Dear Judge Buchwald:

The Government respectfully submits this letter in advance of the sentencing hearing for Carmine Sarnelli, the defendant in the above-captioned case, which is currently scheduled for June 6, 2023, at 11:00 a.m. The defendant pleaded guilty to one count of conspiring to distribute, or possess with intent to distribute, more than 500 grams of methamphetamine pursuant to a plea agreement in which the parties stipulated to a United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 135 to 168 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment (the "Stipulated Guidelines Range"). The United States Probation Office's ("Probation") Presentence Investigation Report ("PSR") calculated the same Guidelines range and recommends the mandatory minimum term of 120 months' imprisonment, which is the same sentence sought by Sarnelli.

## I.  Offense Conduct

In or around December 2019, law enforcement began investigating certain drug trafficking offenses in Manhattan and Suffolk County, New York. During the course of the investigation, law enforcement agents learned that Sarnelli was a large-scale methamphetamine trafficker who would regularly travel into Manhattan to meet suppliers and purchase wholesale quantities of methamphetamine for resale. Sarnelli would then work with others to distribute that methamphetamine, primarily out of hotel rooms in Long Island. (*See* PSR ¶ 8).

Prior to the initiation of the federal investigation, Sarnelli had been arrested at a hotel in Long Island with a large quantity of methamphetamine in or around May 2019. Following his arrest, Sarnelli gave a post-arrest statement in which he claimed that he had been selling methamphetamine for approximately four months, and Sarnelli obtained the methamphetamine seized in the hotel room arrest "in the city," that is, in Manhattan. (*See* PSR ¶ 9).

A few months later, on the evening of August 7, 2019, Sarnelli exchanged messages with another individual ("Victim-1") about meeting in person that evening.  In particular, Sarnelli exchanged text messages with Victim-1 about doing drugs together, including methamphetamine, and told Victim-1 that he was bringing various narcotics with him.  At approximately 6:55 a.m. the following morning, Sarnelli placed a 911 call to report that Victim-1 was choking, vomiting, and had stopped breathing, but Sarnelli was not present when police arrived on the scene. Victim-1 was later pronounced dead.  Later that day, a detective from the Suffolk County Police Department ("SCPD") spoke with an individual believed to be Sarnelli by calling the number that had called 911 to report Victim-1's overdose. The individual who answered identified himself as "Tony" (Sarnelli's nickname), said that he was the 911 caller, and asked to call the detective back later, although he never returned the call.  Medical examiner reports subsequently confirmed that Victim-1 died from a methamphetamine overdose.  (*See* PSR ¶ 10).

After the federal investigation began, law enforcement learned from multiple sources that Sarnelli was obtaining methamphetamine at least in part from suppliers in Manhattan, which he was distributing in or around Suffolk County, Long Island. *First*, beginning in December 2019, a confidential informant ("CI-1")[1] reported that Sarnelli would travel into Manhattan and obtain large quantities of methamphetamine to resell on Long Island; CI-1 repeated to law enforcement that Sarnelli continued to pick up methamphetamine in Manhattan in January and February 2020. Later that year, in or around October 2020, CI-1 reported that he drove Sarnelli into midtown Manhattan, which trip was corroborated by license plate reader records, to pick up methamphetamine, where CI-1 saw the methamphetamine that Sarnelli purchased.  (*See* PSR ¶ 11).  *Second,* following arrests in January 2021, two cooperating witnesses ("CW-1" and "CW-2") similarly told law enforcement that Sarnelli picked up methamphetamine in midtown Manhattan for resale on Long Island, and both CW-1 and CW-2 had previously accompanied Sarnelli into Manhattan for this purpose at the end of 2019 and the beginning of 2020.  (*See* PSR ¶ 14).  *Finally*, beginning in early February 2021, a second confidential informant ("CI-2")[2] likewise reported to law enforcement that Sarnelli was obtaining large quantities of methamphetamine in Manhattan, often driven by his then-girlfriend, who had taken Sarnelli to resupply as recently as January 25, 2021.  (*See* PSR ¶ 16).

Law enforcement agents then began to conduct controlled buys of methamphetamine from Sarnelli, purchasing small quantities from him in January, March, and April 2021, and attempting to purchase methamphetamine from Sarnelli on at least two other occasions.  (*See* PSR ¶¶ 13, 18, 20, 21, 23).  CI-2, who twice successfully purchased methamphetamine from Sarnelli in controlled buys, also observed Sarnelli in the presence of a large quantity of methamphetamine, and heard Sarnelli speak about obtaining his supply in Manhattan.  (*See* PSR ¶ 17).

According to a third cooperating witness ("CW-3"), who used to purchase methamphetamine from Sarnelli and was arrested in September 2021, Sarnelli, who had previously been robbed while selling drugs out of hotel rooms, asked CW-3 to accompany him while he sold

---

[1]    CI-1 was referred to as "Bravo" at the suppression hearing and in related briefing.

[2]    CI-2 was referred to as "Sagan" at the suppression hearing and in related briefing.

methamphetamine from hotel rooms. Sarnelli understood that, on at least one occasion, CW-3 was armed with a firearm. (*See* PSR ¶ 15).

During the investigation, law enforcement agents also obtained warrants showing the location of Sarnelli's cellphones, which further reinforced what the agents had learned about how Sarnelli was frequently traveling to Manhattan to obtain methamphetamine. (*See* PSR ¶ 12). On May 15, 2021, beginning around 2 a.m., cellphone location information for Sarnelli's phone indicated that the phone was located in midtown Manhattan. License plate reader information also confirmed that Sarnelli's girlfriend's vehicle (the "SUV") was in midtown Manhattan at around the same time. The location data for Sarnelli's cellphone thereafter showed the phone returning to Suffolk County on the Long Island Expressway ("LIE"), where law enforcement observed the SUV traveling eastbound on the LIE. Law enforcement agents then stopped the SUV and searched the vehicle and its contents. During the search, various pills, liquid vials, drug paraphernalia, and a large rock of a white substance that field tested positive for methamphetamine were found inside of Sarnelli's backpack. Lab testing later confirmed that law enforcement seized approximately 468.55 grams of methamphetamine from the SUV. (*See* PSR ¶ 24).

## II.  Plea and Guidelines Calculation

On February 16, 2023, Sarnelli pleaded guilty, pursuant to a plea agreement, to a one count superseding information charging him with conspiring to distribute, or possess with intent to distribute, more than 500 grams of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers.

As set forth above, the plea agreement contained a Stipulated Guidelines Range of 135 to 168 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment, based on the following Guidelines calculation. Pursuant to U.S.S.G. § 2D1.1(a)(5) and 2D1.1(c)(3), because the offense involved at least 5 kilograms, but less than 15 kilograms, of methamphetamine, the base offense level is 34. Pursuant to U.S.S.G. § 2D1.1(b)(1), two levels are added because a firearm was possessed. After a three-level decrease for acceptance of responsibility, Sarnelli's total offense level is 33. The parties further agreed that the defendant has no criminal history points and is therefore in Criminal History Category I.

The PSR's Guidelines calculation is in accord with the plea agreement. (*See* PSR ¶¶ 31-41, 44-45, 113).

## III.  Discussion

### A.  *Applicable Law*

Although the Supreme Court held in *United States v. Booker*, 543 U.S. 220 (2005), that the Guidelines are not mandatory, it also held that courts must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"— that calculation "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a court must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are the following:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

Courts may not presume that an appropriate sentence lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### B.  *The Court Should Impose a Sentence Within the Stipulated Guidelines Range*

The Government respectfully submits that a sentence within the Stipulated Guidelines Range would be sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, to afford adequate deterrence, and to protect the public.

To start, the extraordinarily serious nature of the instant offense is self-evident. Over a period of years, Sarnelli trafficked significant quantities of methamphetamine, a potent and dangerous drug that destroys lives and wrecks communities.

This country—including, increasingly, New York City—is suffering through an unprecedented methamphetamine crisis. *See* Centers for Disease Control and Prevention, Patterns and Characteristics of Methamphetamine Use Among Adults—United States, 2015-2018 (last updated March 27, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6912a1.htm ("Methamphetamine is a highly addictive central nervous system stimulant. In recent years, methamphetamine availability and methamphetamine-related harms have been increasing in the United States."); *see also id.* (noting "trends of increasing opioid-related overdose deaths and treatment admissions that involve methamphetamine"). In recent years, high-potency methamphetamine has been increasingly seized in the Northeast, a geographical area of the country that has not historically been a major market for the drug. *See* Drug Enforcement Administration, 2020 National Drug Threat Assessment (Mar. 2021), *available at* https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf, at 19.

Methamphetamine abuse leads to, among other conditions, permanent brain and heart damage, damage to other vital organs, psychosis, hallucinations, violent behavior, and potentially death. *See* U.S. Department of Health and Human Services, Learn About Methamphetamine (last updated August 19, 2022), *available at* https://www.samhsa.gov/meth. As seen in the figure below, the number of overdose deaths from psychostimulants with abuse potential (a category that includes methamphetamines) has ballooned over the past decade, increasing on average about 30 percent each year.



Figure 4. Age-adjusted drug overdose death rates involving stimulants, by type of stimulant: United States, 1999–2018

*See* Hedegaard et al., Centers for Disease Control and Prevention, National Center for Health Statistics, Drug Overdose Deaths in the United States, 1999–2018 (Jan. 2020), *available at* https://www.cdc.gov/nchs/data/databriefs/db356-h.pdf, at 4. Indeed, "The steadily increasing number of deaths from psychostimulants may be due to increased availability and market expansion into areas and user bases that are not traditionally associated with methamphetamine use." Drug Enforcement Administration, 2020 National Drug Threat Assessment, at 21.

While the data on the dangers of methamphetamine use and abuse itself supports a meaningful sentence, there are facts specific to Sarnelli that necessitate a Guidelines sentence.

First, Sarnelli was an active participant in a large-scale conspiracy to distribute methamphetamine over the course of multiple years. As described above, Sarnelli obtained his methamphetamine supply from Manhattan-based distributors, which Sarnelli then sold in and around Suffolk County, Long Island, frequently setting up shop in hotel rooms where customers visited to purchase narcotics. Sarnelli bragged about his business and sold methamphetamine directly to numerous customers and other drug dealers, some of whom included confidential informants and cooperating witnesses. Furthermore, Sarnelli showed no signs of slowing down prior to his arrest. Instead, as described above, Sarnelli continued supplying himself with large quantities of methamphetamine for resale up until the day of his arrest in the instant case. As a reflection of just how much methamphetamine Sarnelli was trafficking, when he was arrested in May 2021, Sarnelli was returning from Manhattan with just under 500 grams methamphetamine—approximately enough methamphetamine *on that trip alone* to trigger the 10-year mandatory minimum sentence required under 21 U.S.C. § 841(b)(1)(A). Accordingly, the Government respectfully submits that a significant term of imprisonment is warranted given the significant quantities of methamphetamine that Sarnelli trafficked.

Second, Sarnelli's drug dealing is all the more troubling because Sarnelli was clearly aware of just how dangerous methamphetamine can be. Sarnelli witnessed firsthand the tragic consequences of methamphetamine use when Victim-1 overdosed in his presence. As described above, in the early morning hours of August 9, 2019, Sarnelli called 911 to report an overdose in progress, and Victim-1 was later pronounced dead after law enforcement arrived at the scene. Victim-1's death, however, did not deter Sarnelli from continuing to traffic methamphetamine. Despite knowing the deadly consequences of the drugs he was selling, Sarnelli continued to distribute them unabated for approximately 18 months after Victim-1's death. Sarnelli went so far as to acknowledge how dangerous and potentially fatal these drugs could be to potential sellers—in a Facebook message with a potential buyer, Sarnelli offered other narcotics besides methamphetamine, such as gamma-hydroxybutyrate, commonly referred to as the "date rape drug", and told that individual that the "only way to get G[HB] is to have it here, not taking no chances O.D. [*i.e.*, overdose]."

Third, while the Government recognizes that Sarnelli has suffered from addiction and drug abuse in his life, and that he has endured harsher conditions while in custody because of the pandemic, these factors do not weigh in favor of a below-Guidelines sentence in this case, particularly considering the other facts and circumstances described above. Indeed, as reflected in the PSR, Sarnelli had every opportunity to lead a law-abiding life: he received an education and spent years working in finance as a broker. Instead of continuing down a law-abiding path, Sarnelli used his skills to run a large-scale methamphetamine trafficking business that caused great harm to the public. He continued to do so after being arrested with a large amount of methamphetamine in May 2019 and after seeing first-hand the fatal consequences of the very drug he was dealing. Thus, while the Government recognizes that Sarnelli has never served or faced the prospect of a lengthy prison sentence like the sentence he faces here, such a sentence is required to protect the public from Sarnelli and to deter him from committing further crime in the future.

For the reasons set forth above, the Government respectfully submits that the Court should impose a sentence within the Stipulated Guidelines Range.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    _/s/_____
Thomas S. Burnett
Emily A. Johnson
David J. Robles
Assistant United States Attorneys

cc:  Christopher Gunther, Esq. (Counsel for Carmine Sarnelli)