N664SARS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

             v.                        22 Cr. 116 (NRB)

CARMINE SARNELLI,

                                       Sentence
                    Defendant.

------------------------------x

                                       New York, N.Y.
                                       June 6, 2023
                                       11:30 a.m.


Before:

                    HON. NAOMI R. BUCHWALD,

                                       District Judge

                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
EMILY JOHNSON
THOMAS BURNETT
     Assistant United States Attorneys

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     Attorneys for Defendant
BY:  CHRISTOPHER GUNTHER
     MEREDITH KELLY

N664SARS

(Case called)

MS. JOHNSON:  Good morning.  Emily Johnson and Thomas Burnett for the government.

THE DEPUTY CLERK:  Is the defendant present and ready to proceed?

MR. GUNTHER:  Yes.

Good morning, your Honor.  Christopher Gunther and Meredith Kelly on behalf of Mr. Sarnelli.

THE COURT:  Let me begin, as I always do, by ensuring that I have received all of the papers in connection with this sentencing.

First, there is the report of the probation department.  It bears a date of May 9 of this year.

Next, there is the submission, and that bears the date of May 22 and has five exhibits.

And finally, there's the government's letter of May 31.

Are there any other documents that I should have received in connection with the sentencing?

MS. JOHNSON:  No, your Honor.

MR. GUNTHER:  No, your Honor.

THE COURT:  Let me confirm that both parties have received a copy of the presentence report.

MS. JOHNSON:  Yes, your Honor.

MR. GUNTHER:  Yes, your Honor.  And I have reviewed it

N664SARS

with my client.

THE COURT:  Does either side have any objection?

MS. JOHNSON:  No, your Honor.

MR. GUNTHER:  No, your Honor.

THE COURT:  All right.  Mr. Gunther, I want to give you the floor.

MR. GUNTHER:  Thank you, your Honor.

I will be brief, because I know your Honor has reviewed the submission that you just listed and is familiar with the case, but I would like to make a few points.

First, as I think your Honor knows from the presentence report, Mr. Sarnelli had a pretty challenging upbringing, not uncommon for defendants who appear before your Honor.  He lost his father quite young.  His mother had a drug addiction problem of her own.

Addiction, I think, is a huge part of the story of Mr. Sarnelli's life that brings him here.  It's not the only part of it.  He's made bad decisions.  But during the offense conduct, he was not just a drug trafficker but a drug addict himself.

I will tell your Honor that during the time he has been incarcerated and forced to become sober, I have seen a remarkable change in Mr. Sarnelli.  I think I have seen, from many conversations and meetings with him, what I think is a real commitment to put the addiction problem behind him with

whatever help is available to do that.  I will come back to that in a minute.

He is not a violent person.  There is no history of violence.  He has had a clean record at the Essex County Correctional Facility, and he's tried to use his time there to improve his well-being, improve his ability to fight the problems that have brought him before you.  We include in our submissions an exhibit, a list of some 200 programs that he completed, online programs while at the jail.  Since that time, he maxed out and completed more than 300.  So he is trying to use what resources are available to him at the facility.

I think probation's recommendation of the statutory minimum of 120 months is appropriate here.  This is a first conviction.  I'm not minimizing the seriousness of the offense, but it's a first conviction for Mr. Sarnelli.  He is 48 years old, and 120 months would bring him into his mid-fifties at a point where I think the recidivism is declining for most persons.  And as I said, I think he is showing a commitment of how he is conducting himself at the jail to leading a law-abiding life.

Aside from the request that your Honor consider 120 months, the statutory minimum, there are two other items that we would ask the Court to respectively consider, which is to make recommendations to the Bureau of Prisons in two respects, and these are decisions that would be up to the Bureau of

Prisons, but I think it would be helpful if your Honor would recommend that the Bureau of Prisons consider designating Mr. Sarnelli to the Danbury satellite camp.  It's minimum security.  Our assessment, if he can qualify, BOP will make its own assessment, but I think it will be helpful to that designation decision if your Honor could make that decision.

THE COURT:  Is it typical that someone who receives at least a ten-year sentence is assigned to a camp?

MR. GUNTHER:  My understanding, and based on research, is that that is a possible designation, given the amount of time he would have left to serve at the time of designation.  As I said, that's our best research looking at the BOP rules.  If we are wrong about that, BOP will make a different decision, but that is what our research shows.  I think that changed over time.  It used to be at that level you could not be considered for a camp, but our understanding is that you can.

THE COURT:  Other than the fact that a camp, as its name implies, is more pleasant, what is the special reason that the Court ought to make that recommendation?

MR. GUNTHER:  I think the other item is, at least it's relatively close to the New York area where family and friends could visit him.

THE COURT:  His minimal family.  There are very few letters in his -- I guess, it's his cousin.

MR. GUNTHER:  And he has an uncle.

THE COURT:  There is someone who is quite ill.

MR. GUNTHER:  I think the uncle is ill.

THE COURT:  I didn't think he was very mobile, if my memory is correct.  It's been a few days since I read those letters.

(Pause)

THE COURT:  It is his uncle, and he is unable to get around.

The reason I raised this is because I was struck, actually, by the limited number of letters, and I know your firm and you would have gotten every letter you possibly could, but, in fact, sadly, most of Mr. Sarnelli's relatives are not alive anymore, and he didn't seem to have a huge amount of friends.  So closeness, in this case, doesn't make particular sense to me, the closeness of his designated facility.

Go ahead.

MR. GUNTHER:  The other item we wanted to ask your Honor to consider recommending is his entry into the residential drug abuse program.  I can describe that program.

THE COURT:  I know what RDAP is.  It's OK.

MR. GUNTHER:  Again, I think this is an issue that, based on our assessment, he would qualify for it, and it would be helpful if your Honor could recommend it.

THE COURT:  I have no problem recommending that, if he qualifies for it, he be admitted to the RDAP program.

N664SARS

MR. GUNTHER:  Thank you.

I think that is all I have, your Honor.  We would respectively ask your Honor to consider 120 months as sufficient for this case.

THE COURT:  Would Mr. Sarnelli like to speak now or speak later?  We know that, or at least I've been told, that there is a relative of the individual, who is only known to me as Victim 1, who is going to speak.  So I don't know if Mr. Sarnelli would like to speak now, or he could speak now and speak later.

MR. GUNTHER:  I think he has very brief remarks prepared which he could deliver now to your Honor.

THE COURT:  All right.  Very good.

THE DEFENDANT:  Good morning, your Honor.

THE COURT:  Good morning.

THE DEFENDANT:  I'm very sorry for what I have done, and I deeply apologize to the Court, my friends, and family that I have hurt.  I'm a nonviolent person, and I will continue to be nonviolent.

Can you please tailor a sentence that will address my drug problem, and thank you for recommending Mr. Gunther and his team.  They have been very helpful.  Thank you.

THE COURT:  Mr. Sarnelli, I have a question for you. In May of 2019, you were arrested by state authorities with a substantial quantity of methamphetamine.  According to the

submissions from the government and from probation, at that time you admitted to the arresting officers that you had been selling meth for about the last four months and that before your arrest you purchased half a pound of meth in the city for $2,200.  Apparently, you were never prosecuted on that arrest. As you know, three months later a person who you were doing drugs with apparently died.  One might think that either of those events or certainly both in combination might have been a wake-up call that you had to deal with your criminal activity as well as your addiction.  Could you tell me why you didn't react in that way, to put it colloquially, clean up your act?

THE DEFENDANT:  Being a drug addict, it's hard to stop, it really is.  And that was -- I had a very difficult childhood.  I'm not saying that's an excuse.  Once you're on drugs, it's very hard to quit.

THE COURT:  OK.  We can either hear from the government or a representative of the family.

MS. JOHNSON:  Your Honor, I defer to Ashley Abru, who is the victim's sister, who would like to speak.  I defer to her if she would like to speak now or after I make my remarks. It sounds like she'll speak now.

MS. ABRU:  Dear Judge, I'm writing to you today to represent my brother, on behalf of me and my family, who tragically lost his life by a drug overdose that was caused by the defendant.

N664SARS

THE COURT:  I know you are nervous.  Just slow down a little bit.  It will be better for all of us.

MS. ABRU:  I understand.

The loss of my brother has had a profound impact on our family, and we are still struggling to come to terms with the reality of his absence.  My brother was a kind and caring person who was loved by everyone who knew him.  He had a bright future ahead of him, but his life was cut short by the actions of the defendant.

Their negligence and disregard for my brother's safety led to his untimely death, and we are still grieving from the shock and devastation of his loss.  The loss of my brother has had a significant impact on our family.  We have all been devastated by his death, and we are struggling to cope with the grief and the sense of loss that we feel.  My mom has been significantly affected by his death, as no parent should ever have to bury their child.  She is heartbroken and finding the strength to carry on.

In addition, to the emotional impact of our brother's death, my siblings and I have been impacted as well, because he was our light in this dark world.  He always was a positive individual even when he was going through hardships himself.  He was the light of the whole family, and no one is ever going to take his spot.

He was so excited to meet my daughter, who is now

N664SARS

three years old, and he wasn't even able to meet her.  That's all he ever talked about when he found out I was pregnant.  It hurts, but she knows who he is.  We kiss his picture now and then and let her know he loves her.  The love is still there.  Now she carries his name.

We are devastated, and this has been a difficult and emotional time for all of us.  To you, he may have been a nobody, but to us he was everything.  He was loved and cared for.  He didn't deserve this and no one does.  How can someone have the heart to do what you have done?  Was he an experiment?  Did he mean anything to you?  The fact that he was gay, did you think he was an immoral deviant and unaccepted?  He was a human being just like the rest of us.  That stigma you had given, the thought he was a guinea pig, someone to play with, led to his untimely death, coldhearted.

I'm writing to you today to ask for justice for our brother and our family.  We believe that the defendant should have been held accountable for his actions and that justice should have been served for our brother's untimely death.  We hope that the Court will consider the impact that my brother's death has had on our family when making this decision.

Thank you for your time and consideration.

THE COURT:  Thank you.

By the way, how old was your brother when he died?

MS. ABRU:  He was 27.

N664SARS

THE COURT:  Thank you.

MS. ABRU:  No.  34, sorry.

THE COURT:  All right.  We'll hear from the government.

MS. JOHNSON:  Your Honor, I have just a few points, because I know the Court presided over a lengthy suppression hearing and is familiar with the facts of this case.

As the government's submission set out, we are seeking a guideline sentence here for a few reasons.  First, the seriousness of this offense just can't be overstated.  We cited some statistics in our sentencing letter to the Court that set out how much the use of methamphetamine has really hit the northeast in recent years, which is an area of the country that previously did not have nearly as much methamphetamine use or trafficking.  As a result, the number of overdose deaths caused by methamphetamine and other stimulants of that nature has increased severalfold over the last few years.  For that reason alone, this is a significant offense.

Second, Mr. Sarnelli trafficked a large quantity of this dangerous substance.

THE COURT:  What do you mean by a large quantity?  In other words, when he would go into Manhattan to purchase drugs, what was the amount of money that was changing hands at that point?

MS. JOHNSON:  Your Honor, I don't have a good sense.

THE COURT:  You keep talking about how large this is. I don't want to minimize it, but it appears to me -- and you're right, I have sat through the suppression hearing.  But what it seemed to me to be is that Mr. Sarnelli would buy some quantity of drugs for some amount of money that I don't know, and you don't know.  He would return to Long Island where he would sell the drugs, and when he ran out he would go back, buy some more and repeat that pattern.  He didn't make drugs.  It was pretty much a one man show maybe with some assistance, but it didn't feel ever that this was some highly structured business.

MS. JOHNSON:  If I may, your Honor, just a few thoughts in response to the Court's question.

You are correct that we don't have a good sense of the money that changed hands, but we did calculate approximate drug weight based on our seizures plus information from our CIs and our cooperators.  And I would say that is a very conservative estimate, because what we are using is information from our witnesses, who didn't have a full view into Mr. Sarnelli's operations.  And that places his drug weight between 5 and 15 kilograms of methamphetamine, which I submit to the Court is a significant amount.  I would say that doing the weight calculation, from what our witnesses have told us, that that probably puts us much closer to the 15 end, based on their information.  So if we had a fuller picture into his operations we might be able to, you know, get a larger quantity, but we

don't, so we have to use the evidence that we have.

I would also note this seizure from the car stop is about just under 500 grams of methamphetamine. 500 grams triggers the (b)(1)(A) threshold in this case. Based on that one trip alone, Mr. Sarnelli was bringing in almost (b)(1)(A) weight from the city. We know, based on the testimony that the Court heard, Mr. Sarnelli was making several trips to Manhattan. He had made a trip a few weeks prior. The CIs and the cooperating witnesses have told the government about how frequently he would go into the city. So I think it's a fair guess that each of those trips are about that weight.

I will say, in terms of money, I think methamphetamine, as compared to other controlled substances, is somewhat less expensive. So we don't have a good sense of it. Our only real sense is from the May 2019 interview that your Honor had highlighted. And as you saw there, a half a pound is around $2,000. It's a more affordable drug than something like cocaine or heroin.

And picking up your Honor's questions about May 2019 and August 2019, when the victim overdosed in Mr. Sarnelli's presence, the government submits that those are instances in which the defendant was in full knowledge, with a May 2019 arrest of his illegal activity and with an overdose death, of just how dangerous this substance is. Yet, he continued for at least two years past that May 2019 arrest. He continued to go

into the city, he continued to buy drugs, and he continued to sell drugs.

Also, as we highlighted in our submission, with the Facebook communications, you know, they talked about the dangerousness of using GHB and saying that that drug had to be used in his presence because of the risk of overdosing.  He knew the risks, and he chose to take them anyway for years.

And just in response, briefly, to Mr. Gunther's remarks about recidivism.  The government does submit that deterrence is very critical in this case.  Mr. Sarnelli led a law-abiding life.  He was working, had a job as a stockbroker, and he stopped doing that and became a drug addict in his later years.

THE COURT:  I thought he lost his job as a stockbroker because of his addiction.  I'm not questioning he switched to be a drug dealer at that point but that his addiction resulted in his loss of legal employment.

MS. JOHNSON:  Yes, your Honor.  That may be the case, but he was someone that held down a job for many years.  At a time when the science tells us that folks are less likely to engage in criminal activity, he did start engaging in criminal activity at that age and not just as a user.  I appreciate that addiction is difficult, and it is very difficult to overcome, but there is a difference between being a drug user and a drug trafficker.  And Mr. Sarnelli was a drug trafficker.  He

N664SARS

trafficked 5 to 15 kilograms of methamphetamine from the city to Long Island, and those drugs caused serious consequences.

THE COURT:  I understand what you're saying, but you have some non-lawyers in the room.  These are tables in which a quantity of methamphetamine gets translated for sentencing purposes into another quantity.  It is not that he is carrying kilograms of drugs with him.  Fair?

MS. JOHNSON:  Fair.

THE COURT:  So I just don't want the members of the public, who are here, to get the impression that he is, you know, lugging 15 times 2.2 pounds, over 30 pounds of drugs.  He's not.  This is a translation that we do for sentencing purposes.

MS. JOHNSON:  Yes.  And it includes the entire time period from approximately January 2019 to May 2021.  So it's approximately two and a half year time period.

THE COURT:  I will not say what I was about to say.  Thank you.

MS. JOHNSON:  Unless the Court has any questions, we will rest on our submission.

THE COURT:  Mr. Sarnelli, I heard other people speak.  Now do you wish to say anything further before sentence is imposed?  It's totally up to you.  It's just an invitation.

THE DEFENDANT:  I'm really sorry for what I've done.

THE COURT:  In many ways, this case is similar to

N664SARS

others which have been before this Court.  It is not uncommon for a defendant to have had a difficult if not brutal childhood.  It is not unusual for drug dealers to be addicts themselves.  It is not always easy for those of us who don't have addictive personalities or are just not ever going to become addicts to understand how difficult it is once you are an addict to stop being an addict.  Certainly, it is not unreasonable to have the view that Mr. Sarnelli should have snapped out of his pattern of addiction based on things that happened, but I think it's probably easier said than done.

To some extent there may be a law enforcement failure here.  He was arrested back in April of 2019 and not prosecuted.  I don't know why.  There may be a very good reason.  And obviously there was a serious consequence.  I think often, because we have a system of mandatory minimum sentencing in drug cases which is the result of an appropriate recognition by society of how dangerous drugs are and the harm they can cause, we get a little less sensitive perhaps than we ought to be about how long ten years is, that's the 120 months. It is truly a long time, and it is a serious, serious sentence. If we were not in the COVID world, where being in custody has been even more difficult, a sentence above ten years might have been appropriate, but it has been recognized, I think by virtually every judge, that the difficulties of being incarcerated during COVID merit some consideration.

N664SARS

Accordingly, I sentence Mr. Sarnelli to 120 months. He is placed on supervised release for five years. There is a $100 special assessment. All of the mandatory standard and special conditions of supervised release that are set out on pages 30 to 32 of the presentence report are imposed. I further recommend that it is appropriate that Mr. Sarnelli be given the opportunity to participate in the RDAP program. I'm not making the recommendation to where he should be incarcerated. If he has not already waived his right to appeal, I advise him that he has 14 days to appeal his sentence.

OK. Is there anything further?

MS. JOHNSON: Just two administrative matters, your Honor. First, I know the Court confirms that the parties have no objections to the PSR, but I want to confirm that the Court adopts the calculation guideline in the PSR.

THE COURT: That's correct, yes.

MS. JOHNSON: And the government also moves to dismiss open counts.

THE COURT: That's important. The government's motion is granted.

MR. GUNTHER: Nothing further from the defense. Thank you.

THE COURT: Very good. Thank you.

(Adjourned)